ELIZABETH CONLIN, Appellant, v. THOMAS J. CONLIN, Appellee.

**Marriage and divorce:** INHUMAN TREATMENT: EVIDENCE: SEPARATE
1 MAINTENANCE. Where a wife left the home of her husband apparently because of difficulty growing out of the fact that his

mother lived with them, and upon her subsequent return in apparent good faith with a view of again living with him he refused to permit her to remain, which was his duty under the circumstances as shown, he was not entitled to a divorce but the wife was entitled to a decree for separate maintenance.

Separate maintenance: AMOUNT OF AWARD. In this action the evidence shows the defendant to be worth $18,000 or $20,000: that he has a salary of $1,800 a year and some income from another source, but was considerably in debt. *Held*, that an allowance for separate maintenance of $30 per month and $1,200 for suit money and support pending the action should be awarded the wife.

*Appeal from Dubuque District Court.*—Hon. J. W. Kintzinger, Judge.

Tuesday, January 13, 1914.

Plaintiff brought this suit for separate maintenance, charging desertion. By cross-petition defendant asked for a divorce, also charging desertion. Plaintiff's petition was dismissed, and a decree of divorce granted to the defendant. The court rendered judgment against defendant for $1,000 alimony and suit money, and for costs; awarded plaintiff the personal property removed by her from the home. The plaintiff appeals.—*Reversed.*

*Hurd, Lenehan & Kiesel,* for appellant.

*Nelson & Duffy* and *Kenline &- Roedell,* for appellee.

Preston, J.—There was a courtship of about fourteen months between the parties to this action, and they had known each other for many years. They lived together more than two years, which is doing better than many others do. He was a widower, forty-six years of age, and she a spinster of thirty. They were married in November, 1905, and separated in March, 1908. In January, 1909, she brought suit for divorce on the ground of cruelty, and he filed a cross-petition,

asking a divorce on the ground of cruelty. The bonds were not severed, and after a trial, in June or July, 1909, both the petition and cross-petition were dismissed on the merits. Plaintiff brought another suit December 22, 1910, which was dismissed without prejudice in June, 1911.

The present action was brought in September, 1911. Plaintiff charges the desertion to have occurred on December 7, 1908, while defendant alleges that plaintiff deserted him in March, 1908. The only question in the case is as to which is guilty of desertion, but there is an abstract of two hundred and eighty pages, and appellee has filed an additional abstract of two hundred pages, and the transcript, containing about 1,600 pages, has been certified. The sayings and doings of the parties in their brief but stormy voyage are set out in the record in minute detail and with some repetition. As is often the case, the troubles of these people commenced over trifles which might well have been overlooked. Neither seems to have fully appreciated the duties and responsibilities of the marriage relation. Neither one is blameless; it is a case of six and six.

One cause, if not the principal cause, of the trouble was the fact that defendant's mother lived with them. She was an old lady of eighty-two years, with nothing else to do, and wanted to help manage the household affairs. Plaintiff claims that the old lady wanted to take entire charge. There seems to have been sincere affection between defendant and his mother. It is to his credit that he sincerely desired that his mother should have a good home in her declining years. Plaintiff knew before the marriage that the old lady was living in defendant's home, and defendant claims, though this is disputed by plaintiff, that it was understood that the mother should continue to live with them after they were married. The plaintiff and the old lady were perhaps both to blame, though it must be said plaintiff did not treat the old lady with that patience and respect due to one of her age. As it turned out, it was a disagreeable situation for both. Plain-

tiff claims the defendant sided with his mother in their troubles.

It is undisputed that plaintiff did leave defendant's home in March, 1908, as she claims, because of the ill treatment by defendant and his mother.   Defendant claims she left of her own accord and without just cause and
1. MARRIAGE AND DIVORCE: in-human treat-ment; evi-dence; sep-arate main-tenance. because she desired separation.   There is evidence tending to show that she stated that she was going to leave defendant at this time, and some of the witnesses state that the reason she gave was because of the disagreements between her and the defendant's mother.   The evidence of the defendant tends to show that, if plaintiff did intend to leave and desert defendant at the date in March, it was not wilful but with the consent of the defendant.   He testifies:

She (plaintiff) said she would rather die than stay there, and I said: 'I didn't know you felt that way about it, but, if you feel that way, there is no use trying to keep you, I guess.' I said: 'I don't see what makes you feel that way.   I have done everything I can.   Maybe I am wrong in this thing, but I have done my best.   If you say you can't stay and that you would rather die than live here, I don't see any sense in my trying to keep you.'   And I said: 'There will be no settlement in this matter.   If you leave to-night, take those things away which you want, as it will save you the trouble of coming back.   Take what you want.   I don't care.'   She said: 'I will come and take them to-morrow, and I want you to be here.'   I said: 'These things are yours as much as they are mine, take whatever you want, but you are not going to bring that stuff back again.   Never try to unload them around where I am again.   Go, but I will have no more talk with you.'

The next morning defendant was advised that there was a message that Mrs. Lindenberg had left for him.   He went over to the house next morning and saw Mrs. Lindenberg at the door, who informed him that plaintiff was there, and asked if he wouldn't go in and see her, and defendant refused

to do so. He also testifies in regard to a conversation with plaintiff's mother, at her home, at about this time, in which plaintiff's mother said that if plaintiff did not want to live up there she could come home; that she had left a good home and could come back to it; and in response to this defendant said, "I guessed she could."

The plaintiff's story in reference to this matter, stated briefly, is that before she left defendant he had often told her to leave, and that he threatened to put her out of the house and force her to leave. That she refused to go. That on the day she did go defendant told her, as he went to his place of business, that if she was there when he came back he would throw her out, or that in substance. She is corroborated to some extent in this by her mother and some other circumstances, and there is evidence on behalf of defendant as to statements by plaintiff prior to this time that she was going to leave because she and the defendant's mother could not get along together. Plaintiff did live with her mother from March until December 7, 1908, when she returned to defenant's home, for the purpose, as she claims, of living with him, and that he forcibly put her out of the house. She told her mother that she was going back. That he put her out of the house is testified to by plaintiff and is admitted by defendant in his answer and as a witness.

Plaintiff's version of this transaction is substantially that when she went back to the house in December she did not say anything to Mr. Conlin about anything she wanted; denies that she said she came back for a settlement, and says that she came back there to remain, to live; says she had not at that time retained an attorney; that Father Barry told her to go back; says she went back there to live, and had no other purpose. This was on December 7th; it was cold weather, about noon. Mr. Conlin was not there, and she sat down in the dining room, and that she had no conversation with defendant's niece or mother; that defendant came in about a quarter after twelve, and came in the dining room, and said,

"Your attorney told you to do this." That this was the first thing he said, and she said, "I have no attorney." She says she did not have an attorney at that time, but in this she contradicts herself, at least she had consulted an attorney before this. She says further that she told him Father Barry told her to go back. That at that time defendant's mother came downstairs, and they went into the kitchen together. Defendant came back and said to plaintiff, "You will get out of here." That he grabbed her by the arm and pulled her out of the door. That he knocked her against the door and knocked her glasses off, and that there was a gash cut in her wrist. That when they got into the hall he held her with his knee until he opened the door. That he held her against the wall, with one arm around her back. That his knee was against her side, and he opened the door and threw her out and she fell against the porch rail. That he pushed her with such force that she struck the railing and fell. That she did not have her wraps on. That she had left her coat, muff, hat, and rubbers in the house. That she went to the neighbors, and a woman who was there went over and got her glasses and brought her things over to her. That at this time she weighed ninety-seven pounds and he weighed two hundred and fifty pounds. That from there she went to her mother's and had lived there ever since. That defendant has not seen her or supported her since then.

The defendant's version of this transaction is substantially that he never talked with his wife from March 16, 1908, to the 7th of December; that on that date, when he came home about twelve o'clock, he went in where plaintiff was sitting, and said, "Lizzie, what brings you here?" and that she said, "I came for a settlement; I want my share." That she said she was going to stay there until she got a settlement of some kind. He testifies: "I told her I didn't think she ought to come there and that she knew she couldn't stay there under the circumstances." That she said she would stay until she got her share and then she would leave. That defendant then

said to her: "It is no use; it can't be determined now. You will have to leave anyway, and you know I can't let you stay here." And that she said, "I won't leave." The defendant continues:

I told her that I would have to put her out. I don't want to put you out; your attorney sent you up here; and you go back and tell them that I will waive all rights now. Lizzie, you know you can't stay here under these conditions. Now go in peace. I am not bothering you, and I don't think you ought to come up here. I got up and walked out in the kitchen and thought it over a while and then came back and asked her if she wouldn't go, if she didn't intend to go away. I couldn't persuade her to go, so I went over and took her by the hands and put my arm around her waist and walked her to the door and opened it and put her out on the porch on her feet. I asked Florence where her clothes were hanging, and I said, 'Give them to me;' and I set them out on the porch and shut the door, and that was the last I seen of her. I didn't press my knee against her side and hold her against the wall while I opened the door. I had to open two doors before I got her out on the porch. I knew that she dropped her nose glasses. Mrs. Gibbons came over and asked for them, and I asked Mrs. Gibbons to take her clothes over to her. I went out on the porch and got them and handed them to Mrs. Gibbons.

He testifies that if she had said that she came there for the purpose of living with him he would have permitted her to remain; and she testifies that when she left in March she still loved the defendant and that she went back and wanted to live with him. Clearly one or the other is mistaken about this or else not telling it just as it was. If they both wanted to live together, there was nothing to prevent it. He admits that he told her in March, 1908, that if she went away she could not come back, and he says the reason he used that expression was because he was trying to persuade her not to go, and he thought maybe that by threatening her he could stop her from going. In regard to putting her out of the house

on December 7th, he further testifies on cross examination:
"Her wraps were hanging on the coat rack in the hall. I
didn't wait until she put on her wraps or anything of that
kind. I didn't get her wraps before she went. It didn't take
me very long to put her out. I took hold of her so as not to
hurt her, but I made sure that she was going, and that was
my purpose, my only purpose." He says it was not very
cold.

Mrs. Gibbons, who went after these things, testified, in
regard to this matter, that she was working at Mrs. Linden-
berg's who asked her to go over to the Conlin house and get
Mrs. Conlin's wraps; that she went over, and Mr. Conlin said
she should take her clothes over to her; that Mrs. Conlin's
wraps were on the Conlin house porch on the railing, and
the glasses were lying on the coat. It was winter weather
at that time when she went over to get the wraps; that plain-
tiff had no wraps on when she saw her, and she was bare-
headed; that her hat was on the porch and her rubbers and
glasses, and that she brought them all over to Mrs. Lind-
enberg's.

Each of the parties is corroborated to some extent by
other witnesses· in regard to these matters, but we think it is
not established by the evidence that plaintiff did not go back
in good faith, or that she went back for an improper purpose.
It should be said here that defendant claims that, after he had
put her out of the house, plaintiff said, "That is just what
I wanted you to do." This is denied by the plaintiff. In
our opinion it cannot be claimed from a fair reading of the
testimony of defendant and the other evidence that he re-
fused to accept plaintiff's offer to return because she was not
asking in good faith but rather because it was his desire that
she should not do so. Under the undisputed evidence, the de-
fendant put the plaintiff out of the homestead, when she had
returned in apparent good faith, and, this being so, the de-
fendant ought to provide for her support and maintenance.
Under the statute, a husband may not put his wife out of

the homestead without her consent. It is said by counsel for defendant that plaintiff had abandoned the homestead in March, but she would have the right at any time within two years to return in good faith to her husband before he could ask a divorce on the ground of desertion.

The plaintiff and defendant lived in the same city during the time from March to December. He had not asked for a reconciliation and refused her offer to return, and it appears that it was his desire that she should not return. The defendant's mother died in 1910, and this action was not brought until September, 1911. There is some evidence that the plaintiff and defendant lived agreeably together when defendant's mother was not in the home; that there were times when the old lady was not there; so that there was more than a year after the death of the old lady and before this suit was brought when the defendant might have requested her to return, and, under all the circumstances shown, we think it was his duty to have done so, and, failing in this, that he consented to her being away.

We are aware of the fact that there are cases holding that the party not in fault is not required to make advances toward a reconciliation to the party who is at fault. We deem it unnecessary to set out the evidence in detail. The record has been read, and our conclusion is that, on the whole record, plaintiff was not guilty of desertion, and that the defendant was not entitled to a divorce, and it is our conclusion that there should have been a decree in favor of plaintiff for separate maintenance. It is a question of fact, and much of the testimony on the important point as to desertion is not disputed, although on other points there is a sharp conflict in the testimony. As stated, the defendant claims that plaintiff's act of returning was not in good faith. But she did return, and it would have been a conclusive test if he had accepted her offer. Having refused to receive her back, he is not in a position to say she did not act in good faith.

As to the amount of allowance that should be made, it appears that defendant is worth about $18,000 or $20,000. It is somewhat difficult to get at the exact amount because a considerable part of his wealth is in corpora-

2. SEPARATE
MAINTENANCE:
amount of
award.

tion stock, and there is a conflict in the testimony as to its value. He is in debt to a considerable extent. He is engaged with another person in the ice business, which is incorporated. He is also interested in another corporation. In the ice business he draws a salary of $1,800 per year in addition to whatever interest or income he may have from his corporation stock and bonds of another company. At the trial of this case in the district court, the court did not rule on plaintiff's application for temporary alimony, suit money, and support, but an allowance has been made in this court of $500 suit money and $17.50 per month for support. Our conclusion is that there should be an additional allowance to plaintiff of $700 for suit money and attorneys' fees in the district court and this court, and to apply on support from the time the suit was commenced until the allowance was made in this court; this is in addition to taxable costs; that she should be allowed $30 a month for her support and maintenance from and after this date. The compensation of plaintiff's attorneys is fixed at $600 for services in this court and the district court, and will be paid out of the $500 heretofore allowed and the $700 now allowed. It should be said that there are no children, and that the defendant acquired all his property before he married plaintiff. Under the record, we are of opinion that there was no adjudication of the question of desertion determined by the decree in June, 1909.

The judgment of the district court is reversed, and the cause is remanded for a decree in harmony with this opinion, or the appellant may, at her election, have a decree in this court.—*Reversed.*

LADD, C. J., and EVANS and WEAVER, JJ., concur.