ELLEN TALLMON, Appellant, v. D. W. TALLMON, Appellee.

**Husband and wife:** SEPARATE MAINTENANCE: DESERTION: EVIDENCE.
1 Where it appeared in a suit by a wife for separate maintenance that defendant and his children by a former marriage so treated plaintiff as to force her to leave his home, and that he refused a reconciliation which she afterwards sought, defendant was guilty of desertion.

**Same:** ACTION FOR SEPARATE MAINTENANCE. An action for separate
2 maintenance, can be maintained before the expiration of two years from the date of the desertion, alleged as the basis of the action.

**Same:** SEPARATE MAINTENANCE: SETTLEMENT: VALIDITY. Where the
3 attorneys settled the claim of a wife for separate maintenance in accordance with their written authority from her, the settlement thus made was a bar to a subsequent action for the same purpose, no fraud in the settlement having been shown; and the fact that the wife disagreed with her attorneys as to the amount of their fees, and refused to accept the sum tendered her by them, would not affect the validity of the settlement.

**Same.** A wife may compromise and settle her claim for separate main-
4 tenance the same as parties may settle their property rights in case a divorce is granted, if the amount is reasonable and fair. In the instant case the settlement for $1,000 maintenance and $325 temporary support and suit money was reasonable.

*Appeal from Franklin District Court.*—HON. R. M. WRIGHT, Judge.

SATURDAY, JUNE 20, 1914.

SUIT for separate maintenance. The trial court, without making any finding of facts or stating his conclusions of law, found for the defendant generally, and dismissed the petition. Plaintiff appeals.—*Affirmed.*

*John M. Hemingway,* for appellant.

*H. C. Liggett,* for appellee.

PRESTON, J.—The parties were married February 21, 1912, and separated finally July 12, 1912. Both had been married before. Prior to the marriage, plaintiff had taken up a claim in South Dakota and was living on it. She was about fifty years of age, and without means. Defendant was a farmer, residing on his farm in Franklin county, Iowa. He owns a half section of land and is worth about $40,000. He has ten children. Five of them, four sons and one daughter, were living with him. The daughter was sixteen years of age, and the others ranged from six to twenty-one years. There was neither sense nor sentiment in this marriage.

1. HUSBAND AND WIFE: separate maintenance: desertion: evidence.

Plaintiff put an advertisement in the paper that she wanted to marry for a home. This advertisement was seen by the defendant, who answered it; it resulted in a correspondence between them. Defendant notified plaintiff by letter when he would arrive at her home town in South Dakota, and he did arrive there on February 20th; they were married the next day. After leaving his home for Dakota, he stopped at Mason City and had an antenuptial contract prepared, which was read to plaintiff and executed by them before the marriage. The defendant attaches to his answer a copy of this contract, but we do not understand that any issue is tendered or any defense founded upon it, although the question has been argued as to some features of its provisions. After the marriage the parties proceeded at once to Minneapolis, Minn., where they stayed all night. The next morning the defendant desired plaintiff to go to his home as a hired girl, which she refused to do at first, saying she would go as his wife or not at all. They then proceeded to Mason City, where she finally agreed to go to his home as a

hired girl. Plaintiff stayed over night in Mason City with a friend, and the defendant went on home alone; the plaintiff followed in a day or two.

The children were not informed of the marriage for about a month. After that there was more or less trouble between plaintiff on one hand and defendant and his children on the other, more particularly with the daughter of defendant. The sixteen year old daughter put plaintiff to work as a hired girl, told her to go upstairs and scrub, etc.

Without reciting the evidence at any length, it is enough to say that the situation was well-nigh intolerable. Some of the circumstances claimed by plaintiff are that the children became saucy, and that defendant did not attempt to prevent it; that the defendant did not treat her properly; that the daughter tried to run things, called plaintiff names, and when she would go outdoors the daughter would lock the screen; that the children put sticks across the hall and darkened the hall as she went to bed; that one of the boys threw a clod of dirt at her as she sat under a tree; that another time one of the boys threw a rock at her as she was sitting in the swing; that at one time, when plaintiff was playing the organ, the daughter called for the boys, and they pulled the organ stool from under her and locked the organ; that she then went down to the swing, and they tried to push her from the swing; that one of the boys said she looked like a bird dog running after defendant, and that after that they would whistle at her and call her "Bird"; that at one time the daughter shut plaintiff in the closet; one of the boys told the daughter to throw plaintiff down and sit on her, and she did so; that they pulled her around, pulled her hair down, and twisted her arm. Many other similar acts and indignities are testified to, as to some of which there is more or less conflict in the evidence. Some are established; others are explained or denied. Plaintiff seems not to have been able to cope with the entire family. It is conceded by appellee that much ill feeling developed because both plaintiff and

the daughter wanted to manage the household. The defendant denies that he mistreated the plaintiff.

The real question presented here is whether defendant was guilty of desertion. Bearing on that question, some of the facts should be recited, which in our judgment show that defendant was at fault and that there was a desertion of plaintiff by him. Under the evidence, we think there can be no serious question but that defendant, from the day after the marriage, desired to rid himself of the plaintiff, and that the tendency of the conduct of himself and his children was to force her to leave.

Plaintiff testifies that the next day after the marriage, when the matter of her going to his house as his servant was discussed, defendant wanted her to go back to her daughter's home in Dakota; that plaintiff refused, and that he then wanted her to go back to her claim; that he then told her that his boys would kill him for marrying her, and said he would be the laughing stock of the country. After they arrived at defendant's home, she says that she sent for her trunk, and defendant refused to get it; that her daughter finally sent it, and defendant left it standing on the porch and would not bring it in. This matter as to the trunk is denied by the defendant. She further says that she complained to the defendant about the treatment of her by the children, and that defendant would always say:

My advice to you is to go. It will never be any better. You had better go pack up your clothes and go.

At one time, when the youngest child was tormenting her, she closed the door to keep him out of the room, and the child's foot was caught, defendant ran into the room and denounced her bitterly, said that she should go away forever, and that she should go away with her daughter and never do another thing there; that she should never ride with him again; that she refused to go with her daughter; that defendant then got up and left the table, and the daughter

followed him, and after awhile came back and ordered both plaintiff and her daughter, who was visiting her, to pack up their things and get out of there, and said that if they did not she was going to throw them out; that her father would give plaintiff $40 to go on, and later $100 to prove up her claim, and that they were to get right out; that plaintiff's daughter went that evening, but plaintiff did not go. She testifies that at one time, when the children threw her down, she told defendant about it and showed him the bruises on her person; that defendant said he was not there, and said afterwards that they had done just right, and said this in the presence of the children. When plaintiff's daughter left, she went to Charles City and sent plaintiff a card to come and meet her when she went through Mason City. She told defendant of this, who said he would take her down next morning to take the 6 o'clock train; that she was sitting in a chair when defendant came in and wanted plaintiff to pack her things and go with her daughter; that plaintiff told him she was sick, and defendant helped her to her room. In the morning he asked her to finish packing her things, and that she refused. Plaintiff went to Mason City, and her daughter advised her to go back to defendant, and she did so the next morning. Defendant's daughter told plaintiff at one time that she could not sleep there any more.

Plaintiff further testifies: That at one time she was going to take some plants to the town of Aredale, and that she wanted to see the doctor and get some medicine. Defendant said he would take her, but that if he did take her she would take her clothes. That plaintiff said in that case she would not go; and defendant then said, "How long is this going to keep up?" Plaintiff said: " 'It can end right here. All you have to do is to make your children behave; I never bother them.' Then he asked me to go to Hampton to get a divorce." That she started to Aredale on foot, but obtained a ride a part of the way. That in Aredale she was in a doctor's office to get some medicine. That defendant's daughter came

in and told her that her trunk was at the depot, and offered plaintiff a check, which she refused to take. After plaintiff returned to Aredale, on the advice of her daughter, as before stated, they telephoned defendant that his wife was at the hotel at his expense, and to come and get her, which he did not do. That two or three days after that defendant came in and wanted to know what plaintiff was going to do. That she asked him if she went back if he would make the children behave, and he said he would make no promises. That they talked a while and she said she would go, and did go. She wanted him to take her trunk, and he refused to do so. She says she talked with him for a long time, tried to reason with him to live together right, and he said he would not live with her as his wife. He would not promise to make the children behave, and said his daughter was to be boss, and that she told him that she would not stay on those terms. That things would not be any better. And she told him he could take her back to Aredale, which he did, and she has not lived there since. After that she wrote him and offered to go back and told him she would do her part. After that a Mr. Thomas and his daughter took plaintiff to defendant's home, and says that, when they drove up, defendant said to Mr. Thomas, "Well, you have brought the old woman back, have you?" in an insulting way, and that she said, "I have come back to live with you, David." As to this transaction, she further testifies:

We went to the house and I got some dinner. After dinner he came in and said, 'So you think you will come back and try it again, do you?' I said, 'Yes.' He said, 'You think you can get along with Edith?' I said, 'Yes.' He told me his advice to me was to go. I said, 'What for?' He said, 'Because if you come back Edith and Harvey will leave.' I said I had as much right there as they had; and he said, 'No, you haven't.' I said, 'You brought me here and haven't given me a chance to earn it.' This was some time in October. He told me to pack up my things and go, and then I went down to the buggy and told him that I would not accept that $500.

The plaintiff's daughter visited her for about two weeks, and corroborates plaintiff as to statements of defendant ordering plaintiff to leave made during that time. She is also corroborated by the witness Thomas and his daughter as to the Thomas transaction above referred to.

Defendant and his witnesses deny and explain some of these transactions, but he does say that when he and plaintiff were at Mason City on their way home, and the next day after they were married, he said to her:

There is time yet if you feel that you don't want to go down there and undertake this; there is time for you to go back to your claim, and I will see you back and will see you through with it.

At the time the little boy's foot was hurt in the door, he says he went in and sat down beside plaintiff's daughter and said to her:

Now, you can see, May, how things are going. It is almost continuous trouble here. Don't you think it would be wise if your mother might go back to her claim? I will pay her way and furnish her money to prove up. When it comes time for her to pay off her claim, I will pay that off, and she can come back.

He admits that the witness Thomas stated the transaction which Thomas testified to about as it was. He also testifies:

If they could live there in peace and harmony, I would be willing my wife should come back. I went for her for somebody to take care and charge of my home; that is exactly why I went into this deal, but I couldn't possibly live the way we have been living; it would make a man sick enough to take any kind of medicine. I never refused to take her back home at any time, never except the time they called me up from Aredale on the telephone, and I never said that I would fetch her back or not. Q. Now, after she got to Aredale, you sent her trunk, did you? A. I took it myself. Q. You took it yourself? A.

Yes, sir. The one thing that I didn't feel right about, that it was wrong— Q. And you gave her a check for $40? A. Yes, I didn't think she ought to go off without some money. Q. You meant by that she wasn't to come back, didn't you? A. Well; I don't know about that, if that was given a thought. She ought to have some money. She didn't want to go without some funds to go on. Q. She didn't need much money to go to Aredale, did she? A. No sir. Q. And you gave her $40 though, with instructions, through your daughter, to use that $40 to go away with, didn't you? A. Yes, sir. Q. You intended that she should go to Dakota with that money, didn't you? A. I thought she was going to go. She left Aredale that same day and came back in a day or two. Q. Then she requested you to come and get her, didn't she? A. Yes, sir. She didn't, Mrs. Miller did.

Mrs. Miller is the lady who kept the hotel and who telephoned defendant to come and get his wife.

The transaction above referred to in reference to defendant taking plaintiff's trunk and giving her the money occurred in July, 1912. As already stated, plaintiff returned in October and offered to live with defendant. Defendant questions her motive in coming back at this time, but it is enough to say that he refused to receive her back. Had he done so, or expressed a willingness to take her back, we would have a different question. *Conlin v. Conlin*, 163 Iowa, 420.

After considering all the evidence, it is our conclusion that the defendant and his children, with his knowledge and consent, so treated plaintiff as to force her to leave, if indeed that was not the purpose. She did leave because of it. She came back in October and sought a reconciliation, which was refused by the defendant. He was guilty of desertion.

It has been held by this court, and it seems to be now settled, that under such circumstances, where separate maintenance only is asked, the action may be maintained, although two years has not elapsed. *Hirschl v. Hirschl*, 161 Iowa, 648.

2. SAME: action for separate maintenance.

II. The defendant pleads as a defense that, after the

separation and desertion in July, there was a settlement between the parties, which is pleaded as an estoppel and bar to this action. The settlement was had when they were living apart and at a time when she had a cause of action against defendant for separate maintenance. She employed attorneys to bring action for separate maintenance, or to settle her claim against defendant. A petition was prepared and signed by her, but not filed. This was in August, 1912. Negotiations were opened; plaintiff at first claiming $3,000, and the defendant offering a small sum. Her attorneys were unable to secure a proposition from the defendant for more than $1,000. She was so informed, and the following written authority was executed by her:

3. SAME: separate maintenance: settlement: validity.

I hereby appoint D. W. Telford and F. A. Ontjes to act as my attorneys in all my claims against D. W. Tallmon, my husband, and I authorize my said attorneys to settle my claim for support, separate maintenance, and all my claims of every kind against D. W. Tallmon, for the sum of $1,000, and I authorize my said attorneys to take notes in payment of said amount, and I authorize my attorneys to do what in their judgment may seem best in the matter of my claims against D. W. Tallmon. August 26, 1912.

                          MRS. ELLEN TALLMON.

Thereafter defendant executed two notes, one for $600 and one for $400, payable to the plaintiff. They were afterwards indorsed by her and negotiated by her attorneys, who offered to pay her the money, after deducting their fees. The attorneys were witnesses and claim their agreement with plaintiff was that they should receive one-half the amount received. She then refused to accept the money, and it is now in the hands of one of the attorneys. There is no material conflict in the evidence as to this transaction, except that plaintiff claims her attorneys urged her to get a divorce; that she was to get a divorce from defendant; and that such was the arrangement by which the notes were obtained, and for which

they were given.  She says she did not want a divorce.  We think her claim as to this matter is not established by the evidence.  The written authority just referred to does not refer to the subject of divorce, and she is contradicted by all the others who testify on the subject.  She seems to have understood the transaction, for she testified:

Q. What was in the paper that Mr. Ontjes read to you?  A. To sign to get the money.  Well, it was that I released D. W. Tallmon of further alimony and separate maintenance, or demands of any kind.  Q. Didn't Mr. Ontjes read to you this paper that you have just looked over before you signed it?  A. Yes, sir.  I say he read it over to me, but I don't recollect a great deal that is in there.  It was merely authorizing them to make a settlement.

No fraud has been proven in the settlement, nor are the circumstances such as to raise any presumption of fraud, and the settlement by her attorneys was within their authority.  That plaintiff had a disagreement with her attorneys and refused to accept the money does not affect the binding force of the settlement as between plaintiff and defendant.  Defendant is now liable for the payment of the notes if, as we understand, they were negotiable.  It would not be equitable for the court to compel him to pay again.  It is now a matter between plaintiff and her attorneys.  Their charge was altogether too large, even though she agreed to it, but she has a remedy against them, if the matter cannot be adjusted without action.  We are of opinion that the settlement was binding.

If plaintiff had a cause of action against her husband for separate maintenance because of his desertion of her, we see no reason for holding that she may not compromise that claim, and agree on the amount, without fighting it out to final judgment.  In a divorce case the parties may settle their property rights, in case a divorce is granted, if the amount is reasonable and fair.  *Martin v. Martin,* 65 Iowa, 255.

4. SAME.

In this case, the amount is not unreasonable. She has been allowed an additional sum of $325 in this court for support, pending the appeal, suit money, and attorney's fees. The parties lived together only four or five months. There was an antenuptial contract, fixing the rights of the parties in their property. There seems to be no issue in the case in regard to the antenuptial contract. As we have already stated, a copy was attached to the answer, and in her reply plaintiff alleges it was unjust, but she does not base her cause of action upon it. That such a settlement under such circumstances is valid, see *Roll v. Roll,* 51 Minn. 353 (53 N. W. 716) ; *Pettit v. Pettit,* 107 N. Y. 679 (14 N. E. 500).

It should be said here that plaintiff bases her right to separate maintenance on desertion, although there is one sentence in her petition which alleges that plaintiff's wrongful treatment tends to endanger her life, but the question of cruel treatment is not argued.

III. Whether or not plaintiff may have separate maintenance because of the provisions of the antenuptial contract need not be determined. Defendant has recognized the right by giving his notes, which he is now insisting upon as a settlement and bar to further recovery.

The judgment and decree of the district court was right; and it is—*Affirmed.*

LADD, C. J., and GAYNOR and WEAVER, JJ., concur.