HELEN CATHERINE MILLER, appellee, v. PAUL ELWYN MILLER, appellant.

No. 49346.

(Reported in 88 N.W.2d 816)

MARCH 11, 1958.

David M. Elderkin, of Barnes, Wadsworth, Elderkin, Locher & Pirnie, of Cedar Rapids, for appellant.

Warren Rees, of Rees & Remley, of Anamosa, and W. Sandoe Jordan, of Jordan, Jordan & Pence, of Cedar Rapids, for appellee.

HAYS, J.—Plaintiff and defendant were married at Independence, Iowa, in 1953. They lived together as man and wife until the bringing of this action in June 1956. Two daughters were born of this union. At the time of commencing the action in Jones County, Iowa, they were living in Bagley, Iowa. The ground alleged as a basis for a divorce and which the trial court found to exist was "such inhuman treatment as to endanger the life of his wife", section 598.8(5), Code of 1954. Under the decree a divorce was awarded to plaintiff and the care and custody of the two daughters.

Defendant appeared specially to attack the jurisdiction of the Jones District Court, which was overruled, and thereafter an answer was filed, rule 66, R. C. P. After the trial of the case and the cause submitted to the court, but not determined, the same was reopened and testimony concerning an incident which happened subsequent to the submission was received and considered by the trial court in its decision. 'The ruling on the special appearance, the reopening of the case for further testimony, and the sufficiency of the evidence to sustain the award are the propositions presented here.

We think a determination of the last proposition, i.e., sufficiency of the evidence, disposes of the appeal and in so doing we assume, without so holding, that the trial court was correct as to the other propositions submitted by appellant.

 Certain factors involved in appeals in this type of action have been reiterated so many, many times as to call for no citation of authority to support them. They are: Section 598.8(5) requires a showing of two distinct matters, inhuman treatment and an endangering of life. A failure of proof as to either is fatal. The cause is heard de novo on appeal and while we give careful weight and consideration to the trial court's findings of fact, such findings do not carry the force of a finding

of fact in a law action and are not binding upon this court. Precedents are of little, if any, value, as each case presents its own particular facts and must stand or fall thereon. See, however, Cooper v. Cooper, 243 Iowa 561, 52 N.W.2d 517; Wilson v. Wilson, 246 Iowa 792, 68 N.W.2d 904; Record v. Record, 244 Iowa 743, 57 N.W.2d 911; Brown v. Brown, 248 Iowa 802, 82 N.W.2d 661.

Plaintiff, before the marriage in issue, had been twice married and twice divorced. She has a son by the second marriage, about seven years of age at the time of this trial. This is defendant's first marriage. The two first met in a tavern-dance hall at Cedar Rapids, Iowa, and soon thereafter their relationship became intimate. They traveled about the state, as well as out of the state on various occasions, as husband and wife. She became pregnant and their marriage followed. Their second child was born in August 1955.

After their marriage they lived in Bagley, Iowa, for a time with his parents, then in Carroll, Iowa, and later returned to Bagley, where they had their own home. Her son by a former marriage lived with them. During most of this time defendant was employed in a general store owned by his father. Her relatives, mother, sister and brother, who lived in Anamosa, Iowa, visited with them on various occasions and it appears significant that, prior to the separation on June 12, 1956, none of them, as well as his parents, knew of any serious rift or trouble between them. The record shows plaintiff to be subject to violent outbursts of temper and a frequent user of profane and obscene language about the home. Defendant appears to have similar traits but not so pronounced. There is also evidence of a few personal combats between them. In general however they seemed to get along reasonably well. She was a good cook and housekeeper. He provided as his means would allow and the children, including her son, were loved and well cared for by both.

Four things appear in the record which the trial court, in its findings of fact, finds sufficient to warrant a decree of divorce.

It appears, without corroboration, but not specifically denied by defendant, that in 1954, during one of their tilts, defendant

728

told plaintiff, "you can't fool me, you are a whore from the Cargill Hotel. It's true because I have slept with you myself down there and I met you in a dark hallway and I paid you $5.00." Plaintiff states she was never in the Cargill Hotel and "I have never been engaged as a professional prostitute." The record further shows: "Q. Now, was this accusation about you having been a prostitute at the Cargill Hotel made to you by your husband at any other times? A. No, he says he don't want to talk about that any more, and I have brought it up many times to see if he would take it back."

Another episode may be referred to as the "Plumber deal", in March 1954. Defendant returned home from the store shortly after noon. He found his wife lying upon the bed (there is a dispute as to the amount of clothes she had on) and a local plumber was in the bathroom that adjoined the bedroom. It appears that the plumber made a hurried exit. Whether there was anything wrong with the plumbing requiring attention and whether it was known to defendant when he returned home is disputed. Defendant admits he jerked her off the bed and slapped her. He also says he may have accused her of immoral relations with the plumber.

A third thing commented upon by the court is plaintiff's charge that he threatened to have her committed to the State Hospital at Clarinda, Iowa. Plaintiff testified, concerning this, as follows: "The occasion usually was that he would say something to me, then I would get real mad at him and then is when he would say it, then you couldn't contradict it, that was it, he said it, and then he would say, 'I am going to send you to Clarinda.' Q. Would you get into a temper? A. Yes. Q. Would you swear when you got enraged? A. Yes. Q. And was that the reason that he made that statement? A. I don't know what the reason was." Plaintiff's mother testified that once when she was visiting in the daughter's home defendant told her, not in plaintiff's hearing, that he was going to send Helen to Clarinda and would get someone to look after the children. Clarella H. Menner, a registered nurse and friend of plaintiff, states that she was present in the Miller home during one of plaintiff's emotional disturbances and they were trying to keep her quiet.

In the presence of the witness and plaintiff's sister, Mr. Miller said he was going to send her to Clarinda.

The foregoing incidents all occurred sometime prior to the commencement of this action. As to the Cargill Hotel and the "Plumber" episodes: In both instances we think the record warrants an assumption that defendant charged his wife with immorality. We have often held such charges may be sufficient to warrant a finding of endangering life. In Levis v. Levis, 243 Iowa 574, 52 N.W.2d 509, it is said that the making of such charges against a sensitive woman has always been held to be capable of endangering the life of the accused. However, so far as the writer has been able to find, we have never held that the mere accusation alone warrants a divorce. When coupled with a showing of nervous breakdown and ill health following such accusations, they may be sufficient.

Under this record one could hardly say we were dealing with a particularly sensitive and cultured woman. See Record v. Record, 244 Iowa 743, 57 N.W.2d 911. There is not a word in the record that she ever experienced any illness, mental or physical, as a result of such accusations. In fact she testified, "My health has generally been good and is now good." The record does disclose anger, understandingly so, and at least as to the Cargill Hotel matter she was the one that was continuously keeping it in the foreground.

Furthermore, we think the old adage that "actions speak stronger than words" is especially applicable both upon the question of inhuman treatment and of endangering life.

Both the Cargill and "Plumber" matters happened long before they separated and prior to conception of their youngest daughter. They lived together after the accusations exactly as they had before. Late in May 1956 plaintiff and her three children left their home in Bagley for a visit with her mother in Anamosa. Their demeanor toward each other at the time of leaving was that of the ordinary family. While in Anamosa she wrote him several letters, and received letters from him, couched in warm and affectionate terms. On June 9 or 10, while in Anamosa, she suddenly decided to bring this action, which was commenced on June 12. Yet she testified: "Q. When you left Bagley to come here to Anamosa, were your relationships

good with him? A. They were passable * * *. Q. When you left Bagley to come to Anamosa, you did not come here for the purpose of changing your residence, did you? A. No. I came for a vacation. Q. When you left Bagley, you intended to return, didn't you? A. Yes." Assuming the required "inhuman treatment" to exist, there is certainly nothing in this record that even hints that because thereof her life was endangered. What has just been said applies equally well to the Clarinda episode.

One incident remains, i.e., the incident which occurred subsequent to the original trial and submission of the case.

On December 2, 1956, plaintiff and the three children were staying with her mother in Anamosa. About 8 a.m., defendant, accompanied by his parents, came to the home. They remained in the car, he entered the home. The evidence is in dispute as to whether he came in unannounced or was admitted by his daughter. His wife was in bed, and the baby was in a play pen in her room. There is no doubt but that he brought articles of clothing, for the wife and children, which were left in Bagley when she started on her vacation to Anamosa. It is likewise clear that he asked her and the children to return to Bagley with him. She refused to go and the record is in dispute as to just what she said and did. At any rate, he grabbed both children and started for the car. A general free-for-all struggle followed which continued out to the car where he gave the children to his parents, got into the car and drove away. It is claimed by plaintiff, denied by defendant, that she and her mother, who had joined in the free-for-all, received terrific beatings. A doctor who examined her a few hours later found some scratches or abrasions upon her chest, but nothing of a serious nature.

Such conduct by the defendant was inexcusable and may be termed as inhuman treatment but it certainly was not such as endangered her life nor did she so contend. It is a case where a father, admittedly very fond of his children, seeks to regain them from their mother who took them away some six months before. He violated no court order which gave them to her or took them from him. While we certainly do not place any stamp of approval upon this conduct, neither do we think this episode

alone is a sufficient showing of cruelty or of an endangered life to sustain a decree of divorce.

██ As stated in Kentzelman v. Kentzelman, 245 Iowa 579, 63 N.W.2d 194, in determining whether either party in a divorce action is entitled to a divorce on ground of cruel and inhuman treatment such as to endanger life, it is necessary to consider the entire record of the parties during their married life and not a few isolated instances. With this as a yardstick we have no hesitancy in saying that plaintiff has failed to establish facts sufficient to sustain a decree and that the decree of the trial court cannot stand.

Ordered submitted with the case was an application by appellee for attorney fees for her attorneys. It appears that an agreement was had between the parties that an allowance of $300 attorney fee for appellee's attorneys should be included in the decree and which by oversight was not so entered. We think an additional allowance of $200 proper.

The decree of the trial court is reversed with a judgment to be entered against defendant-appellant, and in plaintiff-appellee's favor for $500 for her attorneys. All other costs to be taxed to appellee.—Reversed with direction.

All JUSTICES concur except SMITH, J., not sitting.