CLEO M. HARDMAN, appellant, v. ROBERT R. HARDMAN, appellee.

No. 51278.

(Reported in 129 N.W.2d 626)

JULY 16, 1964.

Kartman, Kraschel & Vondrasek, of Council Bluffs, for appellant.

Smith, Peterson, Beckman & Willson, of Council Bluffs, for appellee.

THOMPSON, J.—Rifts in the fabric of marital felicity are by no means uncommon. But marriage is esteemed to be of great importance in our society, and its ties are not to be dissolved except for sufficient cause, which is outlined in the governing statutes. Section 598.8 defines the grounds upon which divorces may be granted in Iowa. The only one of these upon which the plaintiff relies here is found in paragraph 5 of this section. We quote: "Divorces from the bonds of matrimony may be decreed against the husband for the following causes: * * * 5. When he is guilty of such inhuman treatment as to endanger the life of his wife." This is the ground alleged in plaintiff's petition and which her evidence attempted to prove. The trial court found the proof insufficient and denied her the relief sought. So we have this appeal.

██ I. It is axiomatic that the plaintiff had the burden of proving her right to a divorce by a preponderance of the evidence. It is also well settled that each case must be decided upon its particular and peculiar facts, and for that reason prior determinations are not of great value. Baker v. Baker, 252 Iowa 1161,

1162, 1163, 110 N.W.2d 236, 237; Renze v. Renze, 247 Iowa 25, 27, 72 N.W.2d 490, 491, and citations.

■ Another important and established principle that must be applied in these cases is that we give weight to the findings of the trial court. Divorce actions by their very nature lend themselves to contradictions in testimony, particularly as between the husband and wife. So many of the incidents of married life occur in the privacy of the home, without disinterested witnesses, that the credibility of the parties becomes of paramount importance. On this subject we have said: "The sincerity and frankness of answers which vitally affect the weight to be given one's testimony can best be determined by direct observation during that testimony. Obviously the trial court, in forming its opinion as to the truth of contradictory statements of the parties, has the opportunity to observe many things which the printed pages of the record do not offer us." Baker v. Baker, supra, loc. cit. 252 Iowa 1164, 110 N.W.2d 238. See also Clough v. Clough, 248 Iowa 1090, 1098, 84 N.W.2d 16, 20, 21.

■ II. Keeping in mind the foregoing rules, we turn to the record in the case at bar. There is little doubt that the plaintiff's own testimony, taken at its face value from the printed page, uncontradicted and unimpeached, makes a sufficient case of inhuman treatment to require a decree of divorce. She tells of many chokings and blows inflicted by the defendant, and says her health was thereby affected and, presumably, her life endangered. In fact we may assume that severe beatings and chokings repeated often endanger life without any direct statement to that effect.

But the difficulty with her case is not only that the defendant substantially denied her charges, but her own witnesses called for corroboration very much weakened it. While a long and detailed recital of the evidence would be of little benefit as a precedent in future cases, because the same or similar situations will arise most infrequently if at all, in fairness to the parties we shall refer to some of the things which we think cast the weight of the evidence against the plaintiff rather than for her.

Her supporting witnesses were three. The first was Helen

Wallace, a woman friend who had lived close by and had been in the home frequently until and including at least part of the year 1961. She moved away during that year, and had not been in the home during 1962. The time element here is of some importance since the only incidents to which Mrs. Wallace testified occurred some years before the parties separated and the divorce action was commenced early in 1963. Mrs. Wallace said when she was in the home in 1961 she observed nothing; "he was quiet and she was visiting with me."

She testified to one happening in 1958, when an argument occurred and the defendant told the plaintiff "she better not talk to him like that and put his hand upon her throat and she asked him to please stop and he made out like he was fooling, but I don't know, maybe of course it was because I was there and she looked like she was having trouble breathing." She also told some occasions, also evidently before 1961, when the defendant hit the plaintiff on the hand with a "Hy Ho" bat; "what the children play with", when the plaintiff tried to change a television program which the defendant wished to watch. How severe these blows were she did not tell; but in view of the considerable time lapse between the infliction of the possible choking incident and the striking with the Hy Ho bat and the separation and institution of the divorce action, it does not seem that the plaintiff was greatly terrified or felt that her life was in serious danger.

One other facet of Mrs. Wallace's testimony bears attention. She said when asked to describe the arguments she had heard, that once when the plaintiff asked the defendant "for a dollar for work the next morning, * * * he wanted to know why she needed another dollar." Here we must pause. We suggest that if we should establish a rule that it is inhuman for the husband to require an accounting from the wife for previous disbursements as a condition of further advancements, divorce in the state of Iowa would become practically automatic, and unanimous. We are not at present disposed to go so far.

Mrs. Walter Rhoades was the next witness for the plaintiff. She was employed as a baby-sitter during the daytime for four years prior to December of 1962. The plaintiff testified that

Mrs. Rhoades "often witnessed arguments between myself and my husband." She also said that the defendant accused her of infidelity "in front of" Mrs. Rhoades. Mrs. Rhoades said she heard some arguments, usually about money or "her getting home late the night before or something like that." She did not testify that she ever heard any accusations of infidelity, and she said affirmatively that she never saw the defendant strike his wife. So far as her testimony goes, it shows nothing more than the usual run of family disputes and tends to negative rather than support the plaintiff.

We come then to the testimony of Kathy Marie, the ten-year-old daughter of the parties. There were four children: Karen Jane, age 12; Kathy Marie, who was born on August 16, 1953; Robert Reed Jr., born July 8, 1955; and Richard Lee, age 4. We set out the birth dates of Kathy Marie and Robert Reed Jr. because we think they have a material bearing on the weight to be given to Kathy Marie's testimony.

Kathy Marie corroborated her mother, to a considerable extent, upon the subject of the beatings and chokings. But her testimony is weakened to a great degree by her statement that she saw her father push her mother down the stairsteps, causing her to have a bloody nose. The trouble here is that the plaintiff herself fixed the date of this incident as being "the day after I got home from the hospital after having my third child and it was very hot and the baby was fussing." She said the pushing down the stairs caused "extensive hemorrhaging and a bloody nose." Since this is the only such incident related by her mother, it must also be the one to which Kathy testified. But an examination of the birth date of the third child, Robert Reed Jr., shows that it must have happened in July of 1955; and since Kathy Marie was born on August 16, 1953, she was then something less than two years of age. The strong impression is that she was testifying to something of which she had been told rather than which she witnessed and remembered. It throws grave doubt upon the credibility of her testimony.

Again, we note that the older daughter, Karen Jane, was not called. She was two years older than Kathy, and normally would have a better recollection and appreciation of the inci-

dents of family life. The record shows no reason for the choice of the younger child as a corroborating witness and the omission of the elder.

The net result of the testimony of plaintiff's corroborating witnesses is that her own story is considerably weakened. If the beatings and chokings were so frequent as she related, Mrs. Wallace and Mrs. Rhoades, and especially the daughter Karen Jane, would in all probability have known something of them. But Mrs. Wallace was able to tell of only one somewhat doubtful incident, Mrs. Rhoades saw no physical violence whatever, and Karen Jane was not called, although she, as well as the other children, was in the plaintiff's custody during the pendency of the action and at the time of the trial. We recognize the rule that the plaintiff is not required to corroborate every act of cruelty of which she complains. But the trouble here is not lack of technical corroboration, but of its weight. The burden is still upon the plaintiff to prove her case by the preponderance of the evidence; and it must be shown not only that acts of cruelty were committed, but also, in the language of the statute, that they were so inhuman as to endanger life.

The plaintiff's difficulty at this point is not that her own testimony might not be sufficient to warrant a decree of divorce, nor that she lacks technical corroboration, but that her corroboration from the standpoint of the weight of the evidence is at once too little as applied to the testimony of Mrs. Wallace and Mrs. Rhoades, and too much as to the testimony of Kathy Marie. Mrs. Wallace and Mrs. Rhoades do not support her, in fact weaken her case; and we have pointed out that Kathy Marie, in claiming personal observation and remembrance of at least one incident asserted something unbelievable which throws doubt upon her entire story. We do not say this small girl intentionally falsified; but she may have confused personal observation with hearsay.

III. It is urged that the defendant by admissions corroborated the plaintiff's claims. But as we analyze his testimony, it is that he did not strike the plaintiff, except that on occasion when she had attacked and slapped him, he retorted in kind. He denies ever choking her; his version of these incidents is

that when plaintiff attacked him, he seized her arms and backed her against the wall and held her until her wrath abated.

Likewise, he admits having accused her of infidelity. He also admitted on the trial that these charges were unfounded. False charges of such misconduct may constitute ground for divorce; that is, they may amount to such inhuman treatment as the statute requires. Howe v. Howe, 255 Iowa 280, 284, 122 N.W.2d 348, 350, and authorities cited. But the situation here was that the charges were not publicly made; the defendant says each made the charge against the other; and there is no showing that the plaintiff was greatly distressed by them. She testified that she was compelled to visit a doctor; but this she relates to the alleged strikings and chokings. Nowhere does she say the charges of infidelity endangered her health. And as the able trial court pointed out, the plaintiff was often out late at night without advising the defendant of her whereabouts or what she was doing. The court remarked: "I can't blame a husband for wanting to know something about his wife's whereabouts in times where she is not regularly occupied, in off hours." The plaintiff says that on some occasions when she was absent from the home in the evenings she was working overtime; again, she was shopping; and again with her girl friends. Nevertheless, her absences were somewhat frequent, and they occurred without any previous notice to the defendant. Each of the parties had an automobile; and several times when the plaintiff was absent in the evening without advance explanation, the defendant would take the children in his car and drive around, looking for her.

As the trial court pointed out, charges of infidelity, to serve as ground for divorce, must be openly and publicly made or calculated to humiliate or degrade. The plaintiff says the charges were made in the presence of the baby-sitter, and of the children; but neither Mrs. Rhoades nor Kathy corroborated her on this. The entire record does not show any danger to the plaintiff's life from these accusations.

IV. Trial of the case is de novo in this court. We are not bound by the fact findings of the trial court; but we think they have force and must be given some weight. There are many con-

tradictions in the testimony; and the court which had the opportunity to observe the parties had a better chance than we to determine credibility. We conclude the plaintiff failed to establish her right to a divorce on the ground of inhuman treatment by the defendant which endangered her life, by the preponderance of the credible evidence.—Affirmed.

All JUSTICES concur except HAYS, J., not sitting, and PETERSON, J., who takes no part.