**Mary K. WIGNALL, Appellee,**

v.

**Derald WIGNALL, Appellant.**

**No. 53053.**

Supreme Court of Iowa.

Oct. 15, 1968.

Frank J. Karpan, Albia, for appellant.

E. K. Bekman, Ottumwa, for appellee.

RAWLINGS, Justice.

Plaintiff-wife sought a divorce, custody of child, and other redress, claiming cruel and inhuman treatment by defendant-husband. He answered, generally denying plaintiff's allegations and affirmatively asserting res judicata. Following trial, plaintiff was granted a divorce with attendant relief. Defendant appeals. We affirm.

These parties were married June 1, 1963, separated about November 20th of the same year, and never again cohabited.

On separation the wife promptly commenced her first divorce action. A child of the marriage, Patricia, was born November 23, 1963. The aforesaid divorce action resulted in a decree April 4, 1964, denying relief sought by plaintiff. Subsequently she revealed plans to go to Kansas City for the purpose of there attending a business school. Learning of this, defendant told a Mrs. Allison he was going to take Patricia, and plaintiff's son by a prior marriage, from her. June 29, 1964, defendant commenced habeas corpus proceedings in an attempt to secure custody of Patricia which, to all intents and purposes, resulted in a decree adverse to defendant. However, as best we can determine, he was then accorded visitation rights with the child each Wednesday from 4:30 to 6:30 P.M., and from 1:00 to 6:00 every alternate Saturday afternoon.

About August 15, 1964, plaintiff returned to Albia from Kansas City and resumed her business training near Ottumwa. March 15, 1965, she commenced the present action. June 29th trial court ordered defendant pay plaintiff temporary child support of $15 each week, and $50 "preliminary" attorney's fee.

In April 1965, plaintiff secured employment in Nevada, Iowa, and established a home in Colo. Sometime in June 1966, she

commenced working in Cedar Rapids and moved there.

Plaintiff's testimony reveals most of the marital difficulties involved stemmed from defendant's persistent abuse of court granted visitation rights. Usually when defendant called for the child it was evident he had been drinking. When plaintiff voiced objection to his taking the child in a car defendant let her know he would do as he pleased. Seldom, if ever, was the little girl returned to her mother within the time specified, and on several occasions was kept away a day or two after the return deadline. Plaintiff then had to frantically search for her child. When finally returned home, after each visitation with the father, Patricia was tired, dirty and sick.

This constant harassing conduct on the part of defendant, with attendant worry, caused plaintiff to be upset; she became a nervous wreck, could not eat, and lost weight. Two doctors were consulted. They prescribed medicines for her nerves which she took until moving to Cedar Rapids. There, removed from contact with defendant, and the effect of his distressing behavior, her health improved.

Defendant repeatedly argued with plaintiff, and his child support payments were at best sporadic.

Plaintiff expressed the belief her health was endangered to the extent her life would eventually be affected by defendant's conduct and she would not live with him under any circumstances.

One Sunday morning while plaintiff was residing in Colo, defendant called for Patricia and after some delay broke open the door to plaintiff's rented quarters, falsely accused her of "shacking up" with the landlord who was then present doing some repair work in the apartment, and of neglecting the little girl.

The foregoing factual situation is supported in substantial part by three plaintiff-called witnesses.

According to defendant he is steadily employed, has all the furniture stored in a building which could be used for a home, and hopes plaintiff will there rejoin him.

A fair portrayal of the remainder of defendant's relevant testimony can best be effected by quoting portions of the record.

"As to the testimony that I had been drinking on almost every occasion that I came to Mrs. Glassford's [plaintiff's mother] to pick up the child, well, I guess everybody knows that I am subject to taking a drink once in a while, but I have never gone after that child in a drunken condition. I normally work from eight to four and on Wednesdays I would go to pick up the child between a quarter after and four thirty. I would leave from work. I don't believe the accusations are true that on Wednesdays when I came to get the child that I was drinking. * * *

"I heard Mrs. Allison testify to a conversation she had with me. Well, that was true, what she said, but I didn't mean it in the sense that I was to take the children. I was feeling if my wife was to be in Kansas City, and I was father of our daughter, that it would be just as much my part to have custody of the children while she was gone as it was her mother. I did take legal action to get custody of the child. I didn't intend that that should be a threat to my wife or anyone else, as far as physical taking of the child or anything like that. That was the only way that I could see the child at all, possibly. * * *

"I don't recall accusing my wife of improper relations with her landlord as she stated it, but I do recall telling you, my attorney, that she was keeping time with her landlord and drinking a lot of coffee with him. I told her that I didn't believe it was right. I suppose the landlord lived at the residence where she was staying. He was always there when I was there. I did not accuse my wife of committing adultery with that man. * * *

"I did not always stop at a tavern before going to pick up the child. My favorite tavern is the cigar store on the north side of the square. I don't know if one of their objections when I went to get the baby was that they could smell liquor on my breath. * * *

"At Colo, I went in the house. No, I didn't push the bolt open. I don't know where I knocked the bolt off the door. I almost certainly waited the biggest part of an hour.

"Q. The landlord was there on different occasions, doing some repair work and you got the idea in your mind that she was shacking up with the landlord and you let her know in no uncertain terms that she was shacking up with the landlord, and that was the argument or contention that you people had when she lived at Colo? Right? A. I don't know that it was taken that way.

"I didn't make any effort to find out that the landlord lived at some other location in Colo but he did personally tell me that was his house. I didn't inquire where he resided, because I didn't feel it was any of my business. We heard Mary say that I said she was shacking up with him. I don't recall telling her that in those terms.

"Q. Any time you talked to her, you talked to her in a pretty positive way, didn't you? A. I was her husband, but positive terms, I don't know what that means.

"Q. You were very definite about it, that she was living with her landlord, and you didn't think it was right for her to live there with the landlord in the same house. A. I don't feel that it was, no. She was living there, it wasn't me.

"Q. I know but you let it be known to her in no uncertain terms that she was living there in that same house with her landlord. A. She must have thought that.

"I don't recall accusing her of that. Mrs. Glassford let me know when I brought the baby home sick. I didn't answer her that I would feed her whatever the hell I pleased. I haven't paid any money since the court made an order for temporary support of fifteen dollars a week in this particular case here. I haven't paid the fifty dollars ordered by this Court for attorney fees in this divorce case. I paid some money in the clerk's office since this case started. I have paid fifty dollars. I didn't make any payments for suit money. * * *

"The night my wife came to my house after the child, I remember now it was the day before Memorial Day, and when I went to bring Patty back home everybody was so excited. Apparently, they were all excited because the child had not been returned on time. They said they were wrought up, because they didn't know what happened to the child. I didn't tell them where the child was going to be. They knew that I had her. After I brought the child home, and they were nervous and upset, I decided I wouldn't leave the child there, so I took the child back home to my folks. When Mary came after child at eleven o'clock, or whenever it was in the night, she was nervous and upset. She probably caused herself to be that way. When she came to the house, she showed she was upset."

Defendant denied Patricia was dirty whenever returned by him to plaintiff after the visitation periods.

On appeal defendant urges the following propositions in support of a reversal: (1) trial court erred in giving consideration to the prior divorce action; (2) trial court erred in finding plaintiff was entitled to a divorce.

■■ I. Our review is de novo. However, in cases of this nature much depends upon the credibility of witnesses, their attitude and demeanor, and we give considerable weight to the fact findings of the trial court, but are not bound by them. Rule 344(f) (7), Rules of Civil Procedure,

and Britven v. Britven, 259 Iowa 650, 652, 145 N.W.2d 450.

■ II. Referring now to the prior divorce action to which defendant alludes, we held in Gerk v. Gerk, Iowa, 158 N.W.2d 656, 659, the res judicata doctrine is applicable to divorce and separate maintenance actions.

■ However, issues which could not have been litigated at time of a prior hearing pursuant to which a decree was entered cannot become res judicata by the fact of its rendition. See Gerk v. Gerk, supra, and Nelson on Divorce and Annulment, section 28.19, page 149.

Citing Hancock v. Hancock, 257 Iowa 119, 122, 131 N.W.2d 757, trial court's decree first notes the fact that in this jurisdiction the entire married life of the parties must ordinarily be considered in divorce actions, especially when the charge is inhuman treatment which endangers life. Trial court next accords recognition to the res judicata doctrine precluding relitigation of matters once finally adjudicated or which could have been previously litigated.

An examination of the record reveals all evidence presented by plaintiff relative to objectionable acts and conduct of defendant on which she now relies for relief clearly followed final submission of the first case.

■ In granting a divorce to plaintiff trial court did not specifically pass upon the res judicata issue interposed by defendant. But this alone is not controlling. First, Defendant has never assailed the omission. Next, by according plaintiff the relief sought, trial court inferentially found defendant had failed to establish this affirmative defense. We agree with that inescapable conclusion.

III. It is, of course, understood a party is required to establish the right to a divorce by the requisite degree of proof.

■ In the instant case the burden was upon plaintiff to prove defendant's conduct was, (1) cruel and inhuman, and (2) that her life was thereby endangered. Code section 598.8(5), and Smith v. Smith, 258 Iowa 557, 560, 139 N.W.2d 453.

■■ There are innumerable courses of conduct, other than outright physical violence, which are sufficient to satisfy the foregoing requirements. Mental cruelty will suffice. In fact, any treatment which denies a person needed rest, peace of mind, and affects the nervous system so health is undermined, may endanger life as effectively as physical violence. This is especially true where danger to life is reasonably to be apprehended. Gerk v. Gerk, supra, loc. cit., 158 N.W.2d 660.

Trial court found that following denial of a divorce on plaintiff's first action, defendant plotted a course intended to harass plaintiff in every way possible not physical, and concluded his conduct was of such nature as to entitle plaintiff to a divorce.

■ There is no reasonable or legally compelling cause to disagree with that conclusion.

IV. Defendant argues an accusation of infidelity is not alone a sufficient basis upon which to grant a divorce.

■ In that regard this court has often taken the position such a charge may be sufficient to warrant a finding of cruelty. Smith v. Smith, supra, loc. cit., 258 Iowa 561, 139 N.W.2d 453. But that in itself is not an adequate basis upon which to grant a divorce. Attendant danger to life must also be established. Miller v. Miller, 249 Iowa 725, 729, 88 N.W.2d 816.

■ And evidence relative to unfounded charges of unchastity or other conjugal misconduct, like other claimed acts of cruelty, must be corroborated.

■ On that point this court held in Britven v. Britven, 259 Iowa 650, 654–655,

145 N.W.2d 450, corroboration is required to prevent collusion between the parties. However, it is not necessary that every detail of plaintiff's testimony be corroborated or that corroboration sustain the decree. It is sufficient if it tends to establish the ground relied upon for obtaining the divorce. Additionally it may be supplied by direct or circumstantial evidence and by defendant's testimony, or by failure on his part to deny that of plaintiff.

Here, as in Britven, supra, defendant either failed to deny plaintiff's material evidence, or was evasive in some of his denials or explanations, noticeably in connection with matter of his abuse of child visitation privileges, and the unwarranted accusation of infidelity on the part of plaintiff.

■ Upon this basis we find defendant-husband's testimony tends to support and lend credence to that given by plaintiff as to both the false accusation attributed to him, and constant abuse of plaintiff in connection with defendant's permissive child visitations.

V. Defendant further argues any accusation attributed to him is not shown to have endangered plaintiff's life.

■ This result might reasonably obtain if defendant's accusation be considered as a completely isolated incident. However, it is evident this was, as trial court observed, a part of the course of harassment pursued by defendant which, as heretofore disclosed, endangered plaintiff's life.

Demonstrably Nelson on Divorce and Annulment, section 6.22, pages 273, 274, says: "Often the false accusation is only one of a number of acts relied upon, as a whole, as constituting an intolerable course of conduct." And see 24 Am.Jur.2d, Divorce and Separation, section 50, page 220.

VI. Defendant also contends he made no *public* charge of immorality on the part of plaintiff.

He refers specifically to Hardman v. Hardman, 256 Iowa 931, 937, 129 N.W.2d 626, 629, where we said: "* * * charges of infidelity, to serve as ground for divorce, must be openly and publicly made or calculated to humiliate or degrade."

■ This does not mean such an accusation need always be made in public, or to or in the presence of others.

As stated in Nelson on Divorce and Annulment, section 6.22, pages 274–276: "In most instances the false charges or accusations relied upon will be found to have been those made to third persons, causing public humiliation; but there is authority to the effect that publication of the charge to others is not a necessary element, the situation not being the same as in a libel suit. It is the effect of the unfounded accusation upon the marital situation and well-being of the spouse accused which is the primary consideration, rather than notoriety."

■ We now hold that if, in an action for divorce on the grounds of cruel and inhuman treatment, there is corroborated testimony disclosing one spouse has falsely accused the other of infidelity, immorality or other unchaste conduct with resultant danger to life of the one so charged, it may constitute such cruel and inhuman treatment as to justify the granting of a divorce, whether the accusation be made publicly, or to or in the presence of others, or privately within the confines of the home, or elsewhere. It is the making of a false charge with attendant danger to life which is determinative, not the place where made.

With regard to the foregoing see also Hand v. Hand, 257 Iowa 643, 645–646, 133 N.W.2d 63; Grimditch v. Grimditch, 71 Ariz. 198, 225 P.2d 489, 493; Hartkemeier v. Hartkemeier, 248 Ky. 803, 59 S.W.2d 1014, 1015; 27A C.J.S. Divorce § 28(2), pages 83, 86; 24 Am.Jur.2d, Divorce and Separation, section 52, page 222; and Annos. 7 A.L.R.3d 762, 794.

In any event, while not here necessarily determinative, the fact that defendant voiced the objectionable charge in the presence of a third person, the landlord, leads to the conclusion it was an utterance intended to humiliate or degrade.

VII. Finally an attempt is made by defendant to invoke the "clean hands" theory. He claims plaintiff is not entitled to a divorce because she has refused his offer to provide a home for her and the children.

 On that subject trial court's decree contains this finding: "The defendant testifies he has expected to resume the marriage relationship at all times since the separation of the parties in November 1963 and that he desires such resumption at the present time. One might doubt this expectation and desire in view of the fact that the defendant filed a counter claim in this proceeding in which he alleged the plaintiff's desertion and prayed for a divorce. This counter claim and a like allegation of desertion, in an amendment to the plaintiff's petition, were ruled under RCP 105 at the beginning of this trial to be of no moment in the present case inasmuch as the statutory period of two years had not accrued when the time that elapsed during the pendency of the present action was subtracted."

This sufficiently answers defendant's last contention.

VIII. On plaintiff's application trial court awarded her judgment against defendant for $150 attorney's fee. Neither party protests this allowance.

It is to us evident plaintiff's attorney is entitled to an additional fee for services rendered in connection with the appeal here taken by defendant. See Code section 598.11; Gerk v. Gerk, Iowa, 158 N.W.2d 656, 664; Sigler v. Sigler, 260 Iowa 748, 150 N.W.2d 287, 292; and Arnold v. Arnold, 258 Iowa 850, 860, 140 N.W.2d 874.

Plaintiff is hereby allowed a fee of $500 to be paid by defendant for legal services performed by her attorney relative to this appeal. Costs are taxed to defendant.

Affirmed.

All Justices concur.