MARIE R. RENZE, appellant, v. FRED RENZE, JR., appellee.

No. 48744.

(Reported in 72 N.W.2d 490)

OCTOBER 18, 1955.

L. E. Sweany and Edward S. White, both of Carroll, for appellant.

Leighton A. Wederath, of Carroll, for appellee.

THOMPSON, J.—Plaintiff brought her action asking a divorce from defendant upon the ground of cruel and inhuman treatment such as to endanger her life. The defendant answered and cross-petitioned, alleging the same ground. After a trial, the district court dismissed both actions. It was the holding of the trial court that neither party had produced evidence of such treatment by the other as to endanger life; and further, that each party was to some extent guilty of conduct contributing to the matrimonial discord. From the judgment of the trial court the plaintiff alone appeals.

I. Code section 598.8(5) provides that cruel and inhuman treatment of one spouse by the other is a ground for divorce if it endangers life. What endangers life is a subject much discussed in this class of cases, and the holdings of the courts are

as, various as the facts which come before them. No two married couples have exactly the same incidents in their lives. Their discords and dissensions differ so widely that it is impossible for the courts to say the determination of one divorce case governs, or even throws great light upon, the proper decision in another. We have said this, in varying ways, many times. Fisher v. Fisher, 243 Iowa 823, 827, 53 N.W.2d 762, 765. It is repetitious, but true, to say that each case must depend upon its own facts. Klepper v. Klepper, 234 Iowa 1138, 1142, 15 N.W.2d 213, 215; Littleton v. Littleton, 233 Iowa 1020, 1024, 10 N.W.2d 57, 59. We must examine each case as it comes to us, and from the record determine whether such cruel and inhuman treatment as to endanger life is shown.

II. Plaintiff and defendant had each been married before, each marriage having been terminated by death. They were married to each other on August 28, 1948, and removed at once to defendant's farm in Carroll County. Plaintiff had three children by her first marriage age 10, 8 and 7. Defendant had four daughters, the eldest of whom was married and living in Carroll. His second and third daughters were of high school age, and did not live on the farm but remained in Carroll. Only the youngest, Joyce, apparently about 10 years of age at the time of the marriage, made her home on the farm with her father and stepmother. The defendant was 49 years of age, the plaintiff a few years younger. For a year or so all went well, but trouble developed and discord continued until the plaintiff and her children left the farm, apparently in 1953.

Plaintiff's complaints are many and are detailed at considerable length. Her major grievances may be summarized as these: The defendant often ignored her and did not talk to her; he made plans without telling her about them, and on occasion took trips without telling her in advance or asking her to accompany him, including one to a Minnesota lake and many times to surrounding towns; he was given to the use of the expletive, "Oh, Hell!", and another very vulgar word; if he did not like what she had prepared for supper, he would take his daughter Joyce and leave, presumably to eat in one of the neighboring towns (plaintiff's daughter Rose Marie says this occurred only once); he failed to purchase the kind of groceries

detailed on the lists she gave him, and the family would sometimes be without some needed staples; he complained if she wished to go to Carroll; he did not treat her children as well as he did Joyce; there was a disagreement about a trip to be made to Omaha by one of her daughters to keep a dental appointment; he did not supply her with money when she requested it; he would not advise her and her children how they might help him with his farm work, and although she wished to make a garden, he planted it himself and kept its location secret until the vegetables came through the ground, when she discovered it in the midst of a field; he would not permit her to lie close to him in bed, but would jab her with his elbow and would roll up in a sheet or blanket; toward the end of their life together he frequently asked her to leave. While this perhaps does not relate all of the areas of disagreement of which the plaintiff complains, it does give a general idea of her case and of the nature of the supposedly cruel and inhuman acts which she asserts endangered her life. She says that defendant's conduct made her nervous, and she lost weight.

Such corroboration as the plaintiff has comes from her three children. None of them refers to many of the complaints set out above. They do corroborate the use by defendant of the profane and vulgar words as charged by the plaintiff, and they tell of numerous arguments, the cause of which they did not know. Some of their testimony seems to harm plaintiff's case as much as it aids it. Thus, Rose Marie, the oldest daughter, said: "I don't know whether she was afraid of him or not; she didn't exhibit any fear." Phyllusann testified that the defendant never threatened her mother, but did tell her to leave. James said he never saw the defendant threaten his mother. She cried a lot, but he did not know what caused it. The children tell of an argument at the dinner table about chickens; apparently the plaintiff wished to raise them, and the defendant disagreed. The actual, although unintended, effect of the testimony of the three children of the plaintiff is to minimize the gravity of her complaints.

The defendant and his daughters say that plaintiff was a chronic complainer; that whenever she had an opportunity to

talk to one of the daughters when defendant was not present, she complained about their father's conduct. They say she wanted to purchase clothes and household appliances which defendant could not afford, and her failure to get these things was the source of much of her dissatisfaction. There is as much credible evidence placing the responsibility for the marital dissensions upon the plaintiff as upon the defendant.

However, we do not think it necessary to weigh the evidence for the respective parties, to determine whether plaintiff carried the burden of proof necessarily resting upon her to support her charges. A fair analysis of the evidence she adduced, even if it had been undenied, fails to leave an impression that anything happened which could reasonably be thought to have endangered her life. There was no physical violence, except for the elbow-jabbing she claims was inflicted upon her when she trespassed upon the defendant's side of the conjugal bed. It is true we have often said physical abuse is not always essential to make a case of cruelty such as to require a divorce. Sullivan v. Sullivan, 244 Iowa 838, 56 N.W.2d 910; Murray v. Murray, 244 Iowa 548, 57 N.W.2d 234; Ernest v. Ernest, 243 Iowa 1249, 55 N.W.2d 192. Many other cases might be cited to the same point. But we think if they are studied carefully it will be found that in each of them there were circumstances which went far beyond anything made evident in the case at bar. Thus, in the Sullivan case, there was evidence the defendant had boasted to plaintiff of his affairs with other women; in the Murray case, the defendant was given to unfounded charges of improper association of his wife with other men, and threatened her with a gun which he carried about the house; in the Ernest case there was a record of offensive and vulgar language indulged in and salacious stories told by the defendant and "most indecent language and conduct indulged in between the defendant and his mother", all in the presence of plaintiff. The citation of these and other cases serves only to illustrate the force of the holding that each case must be determined on its own facts as shown by the record.

On the other hand, the defendant cites many cases in which we have held the requisite degree of cruelty was not established and a divorce was denied. Among these are Record v. Record,

244 Iowa 743, 57 N.W.2d 911; Fisher v. Fisher, supra; and Weatherill v. Weatherill, 238 Iowa 169, 25 N.W.2d 336. Each of these discusses the question before us and cites supporting authorities, with the concession, of course, that no case of this sort is exactly in point with any other upon its factual situation. It would be of no aid to the legal profession to again enumerate and analyze these cases.

■ ■ III. The Iowa law does not recognize incompatibility as a ground for divorce; and something more than incompatibility or family arguments and disagreements must be made to appear. We quoted with approval, in Fisher v. Fisher, supra, 243 Iowa 823, 827, 53 N.W.2d 762, 765, the following from White v. White, 200 Iowa 779, 781, 205 N.W. 305, 306: " '* * * divorces cannot be granted for incompatibility, or because the parties * * * are unable to agree or to dwell together happily.' " Our statute on cruel and inhuman treatment is so drawn that it leaves considerable room for differences of opinion as to whether danger to life has been shown. What endangers life within the meaning of the statute is not subject to exact mathematical determination. In one sense, every action of our daily lives endangers them. The wear and tear of ordinary living, the merchant striving in the market place, the laborer earning his hire, the housewife at her duties, the lawyer arguing his case, all to some extent endanger life. The passing of each day endangers our lives in the sense that they are by so much the shorter. But clearly this is not what the divorce statute means. There must be something "cruel and inhuman", something needless and beyond the ordinary arguments and quarrels of married life, something which the ordinary experience of men or some substantial evidence tells us will endanger life, before a divorce may be granted under the statute. Even though we were to give plaintiff's evidence full credit for veracity, we would yet be unable to say there was reason to apprehend danger to her life. Perhaps the defendant was not thoughtful, perhaps he was selfish, perhaps his language was coarse, perhaps he was not the ideal of a loving husband he might have been. We do not say those things are true, but state them so arguendo only. We also note plaintiff's evidence that she became nervous and lost weight; but we find nothing in the record of defendant's

conduct which in the ordinary course of events would be expected to cause these afflictions. Plaintiff testifies that she consulted a physician, but there is no medical testimony concerning her condition or its cause. We agree with the trial court that plaintiff failed to prove the essential allegations of her petition. Accordingly, it is not necessary to consider the other ground upon which the court's decision rested, that of recrimination. It may be said in passing, however, that the record would support a finding that, while defendant was by no means a perfect husband, the plaintiff was likewise demanding and complaining. Neither of them was guilty of more than unseemly and needless bickering, however, and under the statute as it now stands the trial court could do no more and no less than dismiss each petition.

IV. Without filing a separate application therefor, plaintiff suggests at the close of her brief that this court allow her counsel such additional fees as may appear proper for services in conducting her appeal. To this the defendant responds that the allowances already made are more than adequate. It appears that upon preliminary application the sum of $150 was allowed plaintiff's attorneys for preparation for trial, and that the final decree and judgment granted them another $700.

The rule is laid down in 17 Am. Jur., Divorce and Separation, section 580, page 459, thus: "The allowance may usually be made at any time up to and including the affirmance by the appellate court of the decree below, for the wife's application will not be denied simply because she has managed to perfect the appeal without securing an award in the first instance." Mosher v. Mosher, 16 N.D. 269, 113 N.W. 99, 12 L. R. A., N. S., 820, 125 Am. St. Rep. 654, is cited and supports the text.

However, we have likewise held that we will not allow additional attorney fees upon appeal where the amount secured below seems adequate or excessive. In Votaw v. Votaw, Iowa, 6 N.W.2d 1, 3, we said: "We also hold that the allowance of $800 for attorney fees is excessive and is reduced to the sum of $500, which sum is to discharge the plaintiff's liability to the defendant for legal services rendered in the trial court and in this court on appeal."

In Mitchell v. Mitchell, 193 Iowa 153, 162, 185 N.W. 62, 66, we reduced an award of $1000 made by the trial court to $500 and declined to allow any additional sum for services of the attorneys on appeal.

Defendant has not appealed from the allowance of fees to plaintiff's counsel in the lower court. The total amount received, however, seems adequate and we think is sufficient to cover services in both courts. This seems especially true in view of the fact that plaintiff's case has been found wanting in each court.—Affirmed.

All JUSTICES concur.