JOHN P. HAND, appellant, v. VIRGINIA HAND, appellee.

No. 51594.

(Reported in 133 N.W.2d 63)

FEBRUARY 9, 1965.

REHEARING DENIED APRIL 6, 1965.

Newport, Wine & Schebler, of Davenport, for appellant.

644

Lambach, Shorey & Plath, of Davenport, for appellee.

THOMPSON, J.—"Water dripping day by day will wear the hardest rock away." This old copybook maxim describes the plaintiff's case, now before us on his appeal from an adverse judgment of the trial court. His petition for divorce from the defendant is based upon allegations of cruel and inhuman treatment sufficient to endanger his life, under the provisions of section 598.8, subsection 5, of the Code of 1962. The defendant filed her answer, without cross-petition, denying the material charges made in the petition, and upon trial the court found the evidence insufficient to require a decree for the plaintiff, and dismissed his case. Hence we have this appeal.

There is some evidence, largely denied, of mutual slappings and of some blows struck by the plaintiff with his fist; but it is fair to say neither party claims much for these, and the case must be considered on the basis of the plaintiff's charges of accusations of infidelity, a quarrelsome and domineering attitude on the part of the defendant, and her general marital conduct which affected his health and so endangered his life. The trial court held there was insufficient evidence of cruelty; insufficient evidence that such acts as were proven endangered the plaintiff's life; and that the corroboration was very weak.

The parties were married in Dover, Delaware, on September 21, 1946. It was the first marriage for the plaintiff and the second for the defendant. A few years after their marriage they moved to Iowa City, Iowa, where the plaintiff entered the college of dentistry. They each had some savings, and while the plaintiff was studying in the dental school he worked part time and the defendant all, or almost all, of her time. He graduated from the dental college and was admitted to practice in Iowa in 1952, and at once opened an office in Bettendorf. No children have been born to the marriage; but a few months before Doctor Hand's graduation they adopted a son, known in the record as Johnny, who was then ten weeks old.

Doctor Hand's practice has been successful. During the time of his study at Iowa City the marriage was apparently harmonious; but not long after he commenced to practice his profes-

sion there came a rift in the lute of their marital accord, and it widened from day to day until he moved out of the family home on January 2, 1963. It is the daily friction which he here asserts has affected his health and life.

One factor to be considered is the unfortunate development of the adopted child. Johnny became a problem child as he grew older. He would disappear from home so that at times a considerable search was required. His conduct in school caused much difficulty. Finally he was taken to the Sotherd School for emotionally disturbed children, an adjunct of the Menninger Clinic at Topeka, Kansas, on October 12, 1962, and is still there. The prognosis is for treatment from three to five years. The cost has been $1000 per month until Johnny reaches the age of thirteen, on February 1, 1965, when it increases to $1200. There are incidental charges amounting to $50 to $100 per month. Doctor Hand has paid these regularly. Both parties are apparently fond of the boy.

I. It may be conceded that no one act of the defendant, standing alone, supports a finding of cruelty sufficient to warrant a decree of divorce. But it is equally true that a continued course of wearing conduct, regularly, almost daily, indulged in, may constitute a strain on the nerves and sensibilities which in time may add up to serious damage to health. The constant dripping of the water of criticism, unjust accusations, belittling remarks, and constant evidence of an antagonistic disposition will in the course of time wear away the rock of health and so endanger life. It remains to examine the record here to determine whether it shows such conduct.

It is thoroughly settled that there may be cruel and inhuman treatment such as to endanger life without physical violence. Thus, unjust accusations of infidelity may amount to such conduct. Worthington v. Worthington, 238 Iowa 1044, 29 N.W.2d 186, and cases cited. There may be other treatment, without physical violence, aside from accusations of infidelity, which endangers life. Payton v. Payton, 252 Iowa 772, 108 N.W.2d 358, 86 A. L. R.2d 416; Dillavou v. Dillavou, 235 Iowa 634, 17 N.W.2d 393. Many other cases might be cited. We refer to only one more. In Beebe v. Beebe, 10 Iowa 133, 135, 136, 137, appears this

significant language, which has served as a guide in our cases from that time on: "Cruelty is defined to be any conduct, in one of the married parties, which furnishes reasonable apprehension that the continuance of the cohabitation would be attended with bodily harm to the other." It is also there said: "So that when it is once ascertained that because of the conduct of the guilty. party, the life of the libellant is endangered, the nature of the treatment is inhuman or is legal cruelty."

■ Of course the conduct must be something out of the. ordinary course of marital relations. In Renze v. Renze, 247 Iowa 25, 30, 72 N.W.2d 490, 493, we said: "There must be something 'cruel and inhuman', something needless and beyond the ordinary arguments and quarrels of married life, something which the ordinary experience of men or some substantial evidence tells us will endanger life, before a divorce may be granted under the statute."

II. It remains, therefore, to evaluate the competent and material evidence in the record. That the parties were often, in fact in the later years, in strong disagreement, and that their married life for a considerable time before Doctor Hand left the home on January 2, 1963, was a most unhappy one, is abundantly shown. We must determine where the fault lay, and whether, if the onus for the daily troubles was upon the defendant, the difficulties were beyond the usual marital disagreements so that her conduct was "cruel and inhuman" under the rule of the Renze case just quoted. If we reach this point, there must be a further finding that the plaintiff's health was so affected as to endanger his life, before we can say he is entitled to a divorce as prayed. The burden was upon the plaintiff to show all these things by a preponderance of the evidence. It is our conclusion that he has carried this burden.

As is to be expected in cases of this nature, the chief witnesses for the respective litigants were the plaintiff and the defendant. In fact, the defendant and a private detective whom she employed after Doctor Hand had left the home were the sole witnesses for her case. We can deal shortly with the testimony of the investigator. It dealt with a claimed undue intimacy of the plaintiff with a former neighbor woman, and all events nar-

rated by him occurred after Doctor Hand had left the home. It is sufficient to say that, while some things are shown which might be considered slightly unconventional, nothing appears to show any meretricious conduct on his part and there is no occasion for the application of the doctrine of recrimination. Both Doctor Hand and the woman concerned also denied any improper intimacy.

Doctor Hand testified to a considerable list of grievances. They ranged from repeated accusations by the defendant of improper conduct between the doctor and his female office assistant and demands that he discharge her, through assertions that he thought he was a "big dealer", through unsocial attitudes displayed at parties when complaint was made that the plaintiff was paying too much attention to other persons and neglecting the defendant, through arguments commenced by the defendant with other persons at social gatherings, to daily discord and contention in the home. Some of these things stand undenied in the record; some are admitted, with qualifications; and others are controverted.

At this point it is in order to deal with the question of corroboration, which the trial court thought was weak. Without the testimony of the defendant, it is fair to say the corroboration would not be strong. But as we read the record, her admissions and failure to deny are persuasive and furnish ample corroboration for the plaintiff's case. Nor is it necessary that every part of plaintiff's evidence be corroborated. The rule is thus stated in Payton v. Payton, 252 Iowa 772, 776, 108 N.W.2d 358, 360, 86 A. L. R.2d 416: "* * * it is not necessary that every detail of plaintiff's testimony be corroborated or that such alone sustain the decree. And defendant's testimony may corroborate plaintiff's." We shall later set out some parts of defendant's evidence which we think corroborate the plaintiff.

III. It is of course repetitious to say that each divorce action depends upon its own peculiar facts. The governing law is well settled; it is its application to the record in each case that is important. While it is of no great aid to the profession to set out the facts which we think rule this case, fairness to the litigants requires that we briefly detail the more important ones.

Perhaps the earliest source of discord shown in the record concerns Doctor Hand's dental assistant. She entered his employ not long after he began his practice, and has remained with him. There is no evidence of any improper conduct between them; but there is much evidence that the warped view of a jealous and possessive wife considered there was such. In 1954 the assistant and another woman similarly employed by another dentist went to Des Moines to take examinations to obtain certificates as dental assistants. A few days later Doctor Hand and Doctor Glade, another practicing dentist, went to Des Moines to attend a dental convention. The trips were made separately and the parties stayed at different hotels. However, the time they were in Des Moines overlapped by a day or two, and on one evening Doctor Hand, and several other dentists, with their assistants who happened to be in Des Moines went out to dinner. Several other persons were present at all times.

Mrs. Hand was disgruntled because she was not taken to the convention, and her suspicions were at once aroused. She talked with Doctor Glade's wife about the matter, and finally apparently succeeded in causing the latter to wonder about her own husband. Other trifling incidents were magnified by Mrs. Hand into gross misconduct as time went on; and she made frequent demands that the plaintiff discharge the assistant. This he refused to do. He testified that the woman was a highly skilled dental assistant who could not be replaced; that she took X rays, made models, cast and poured inlays, was liked by his patients and since there was nothing wrong in their relations he felt it was unfair to ask him to discharge her. But Mrs. Hand continued her accusations and demands. At one time, when they were taking a trip to Chicago, she told him he would no doubt be happier if Peggy (the assistant) were with him instead of herself.

These things are qualifiedly admitted by the defendant. She testified that she thought "it was not affairs. I term it a very close relationship." Again she said it was "past the platonic stage." She admitted that she had complained to the plaintiff about "this unusual close relationship" and had made demands that he discharge his assistant.

The defendant thinks that there were at least sufficient sus-

picious circumstances to justify the charges made, citing Coulthard v. Coulthard, 91 Iowa 742, 60 N.W. 213, and Shaffer v. Shaffer, 181 N.W. 261, a case not officially reported in Iowa. But neither of these is factually in point, the ground for suspicion having been much greater in each case. It is also claimed that the accusations of infidelity were not publicly made, and so did not tend to degrade or humiliate the plaintiff. Hardman v. Hardman, 256 Iowa 931, 937, 129 N.W.2d 626, 629. But while the charges in this case seem to have been made chiefly in the home, we consider them as evidence of the daily criticism and scolding which the plaintiff claims he endured. If they did not humiliate through publicity, they did tend to annoy the plaintiff, disturb his peace of mind and aid greatly in maintaining the constant discord between the parties.

There are other evidences of the defendant's attitude toward plaintiff which support his contention that he was worn down by the continual complaints and verbal abuses of the defendant. On different occasions, when they went to social gatherings and the plaintiff visited with women acquaintances, she became disgruntled and insisted upon being taken home at once. She distressed the plaintiff on one occasion when the subject of teachers' salaries came up, and someone commented that teachers did not deserve a great deal of sympathy, since they went into the profession with their eyes open and knew they would not get rich. She replied: "It is just such stupid statements from professional people like you that keep the teaching profession in the financial category it is in." She insisted on this at some length. The defendant herself is a teacher. She refers in her testimony to this incident as a "discussion".

At one time the plaintiff's wedding ring disappeared, and the defendant commented that it was a good thing he lost it, he was a "lousy husband and unfaithful, and you shouldn't be wearing one anyway, it is a good thing you lost it." The plaintiff later found the ring in her jewel case.

She objected to the plaintiff going to the YMCA to play squash occasionally, calling him "an adolescent"; that " 'I had never grown up and never got away from my mother's apron strings and wanted to go down to the Y and run around like a

damn fool 'kid'." She was unhappy when he played golf on Sundays or holidays; and she criticized his mother and other members of his family.

She was apparently resentful of the plaintiff's success in his profession and of his friends. She constantly told the plaintiff he was "a big dealer and a show-off". Her attitude at this point is shown by the plaintiff's testimony that after they had discussed the subject of divorce, she finally said: " 'I have changed my mind, and you are not going to get off as easy as we agreed to. I am not going to ever let you get a divorce. I am going to take you for all you have got and all you are ever going to make, and when I get through with you, you are going to be in skid row without enough money to run that big deal Buick of yours'." This testimony is not denied. She also told him that "when she thought she was worse off in her first marriage, that was nothing as to how she was now"; and that she "really jumped from the frying pan into the fire."

The defendant has some admirable qualities. Her moral character is impeccable; she was an excellent housekeeper—perhaps a bit too meticulous for comfortable living; she is a woman of education and intelligence, and for some three and one-half years prior to the trial had been employed as a teacher in the Davenport school district. But she was also extremely possessive, resentful, unduly suspicious and determined to have her own way and to compel the plaintiff to bow to her demands, many of which were unreasonable and unfair. There is no doubt that she is firmly convinced of her own rectitude and of the righteousness of her judgments. She was unable or unwilling to accept his friends, and their social life was often disturbed by her uncalled-for resentments. Her attitude toward not only the plaintiff but others is shown by her difficulty with her first two attorneys whom she consulted in regard to her marital difficulties. The first was Mr. Henry R. Ottesen, whom she testified she consulted in regard to her desire to prevent the plaintiff from dropping certain life insurance policies. Mr. Ottesen testified the consultation was also in regard to a divorce; but this the defendant denies. In any event she became dissatisfied and consulted another lawyer. Here again she was not pleased; in fact

to the extent that she attempted to bring charges against him before the Scott County Bar Association.

It is true much of the plaintiff's case depends upon his own testimony. But we think, assessing it as best we can and with the aid of some corroboration from other witnesses and particularly from the defendant's own admissions, qualifications and failure to deny, that the plaintiff sustained the burden of proof on the essential factual issues. He admits that no one incident would justify a divorce; but he urges, and we agree, that the overall picture is that of a resentful, complaining, critical, domineering wife, given to unfounded charges and unjustified demands, so that his daily life became "a lifelong discord and annoy". It is the small things that are of greatest importance in the life of most people; and, while some disagreements between husband and wife are to be expected, it must be concluded that even these, carried to excess so that the unhappy husband has no peace of mind and no hope of domestic tranquillity, who is constantly faced with criticisms and complaints and belittlings, may well say he is the victim of cruel and inhuman treatment. One, or two, or a few days of this might be borne; but when it continues for year after year, the constant dripping of the antagonisms may begin to wear away the rock of endurance. Nor does the aggrieved spouse have any real recourse other than to the divorce court. No longer is the procedure outlined in the old English couplet "A woman, a dog and a walnut tree, the more you beat them the better they be" available. Wife beating is no longer an acceptable remedy. The ducking stool went out of fashion several centuries ago; and not many husbands are as adept as Shakespeare's Petruchio in handling these situations. Divorce or long-suffering are the only practical alternatives nowadays.

We do not intend to depart from our previous decisions to the effect that the usual marital misunderstandings and arguments are not in themselves a sufficient basis for a finding of cruel and inhuman treatment such as to endanger life; nor are we holding that incompatibility in itself is a ground for divorce under our statutes. What we are attempting to say here is that a long continued, regular and persistent course of faultfinding,

unjust accusations, criticisms and belittlings on the part of one spouse may amount to such treatment; and when there is in addition a persuasive showing that such conduct has affected the health and to some extent has thereby endangered the life of the other party, a sufficient case has been made requiring a decree of divorce. Arnold v. Arnold, 257 Iowa 429, 133 N.W.2d 53.

IV. Of course, cruel and inhuman treatment in itself is not sufficient. It must be such as to endanger life. The statute plainly so says. But here again the plaintiff has carried the burden of proof. He testified that his health was affected. He became nauseated when the defendant made disturbing phone calls to him at his office; and likewise when the time for returning home to the probable discord approached. He consulted Doctor Teufel, and later went to Dr. Roland E. Erikson, a specialist in psychiatry. He found Doctor Hand suffering from psychoneurosis, a depressive reaction, moderately severe. Doctor Erikson testified: "In my opinion this was due in part to the treatment he received from Mrs. Hand. A major portion of it was due to his marital difficulties with his wife." He also said: "In my opinion this would have a detrimental effect on his health if this continued. Even to the point where it could shorten his life." Of course Doctor Erikson had no personal knowledge of the marital troubles; he took the history of the case from the patient. But, since we have found that Doctor Hand's version is substantially supported by the preponderance of the evidence, it follows that Doctor Erikson's evaluation of his patient's condition must be accepted as relating to the defendant's conduct. It is true that Doctor Hand was also somewhat affected by the trouble about the adopted son; which means only that the defendant's actions aggravated an existing situation or that they were the primary cause. In either case his own testimony and that of Doctor Erikson show a detrimental effect on his health and a resulting danger to life. In Renze v. Renze, supra, we commented upon the absence of medical testimony when the plaintiff's case was bottomed chiefly upon marital disagreements, without physical violence. Loc. cit. 247 Iowa 31, 72 N.W.2d 493. Here we have such testimony, and we think it sufficient.

V. Since the trial court denied the plaintiff a divorce, and

the defendant did not ask for one, no order was made regarding alimony, support allowances, property division, or child custody. There is some evidence of Doctor Hand's property and his indebtednesses; but it is insufficient to permit an intelligent judgment on these questions. Nor do we have the benefit of any argument or discussion in the briefs. Accordingly we must remand the case to the trial court, with directions to enter a decree of divorce for the plaintiff, and to hear and determine the other questions necessary for a final determination. We think the order should be that the custody of the child should be given to Doctor Hand, with adequate visitation rights to the defendant, and leave to her to ask for a modification of this portion of the decree when the treatment at the Sotherd clinic is terminated.

VI.   All orders for temporary support and allowances made by this court under date of September 18, 1964, are hereby terminated forthwith, the matter being returned to the jurisdiction of the Scott District Court for any such orders as may be proper, pending final determination of the unresolved issues. The defendant's motion for attorney fees and costs of appeal, filed in this court on January 11, 1965, is granted in part and denied in part, as follows: Plaintiff is ordered to pay the cost of printing the defendant's brief and argument in the sum of $38.75; the motion for allowance of the sum of $159.75 for a copy of the transcript is denied; and defendant's attorneys are allowed $500 to be paid by the plaintiff for services in connection with the appeal in this court. Whether a larger amount has been earned by counsel we do not decide; we hold only that in view of the financial condition of the parties and the outcome of the appeal the sum allowed is all that the plaintiff should be required to pay.—Reversed and remanded for further proceedings in accordance with this opinion.

All JUSTICES concur.