CAROL V. LEHMKUHL, appellant, v. JOHN H. LEHMKUHL, appellee.

No. 52265.

Ted Sloane, of Des Moines, for appellant.

Robert W. Brennan, of Des Moines, for appellee.

LARSON, J.—At the outset we must repeat our feelings in matters of this kind. It is regrettable that this marriage has floundered, for we doubt that the divorce granted on defendant's cross-petition will lead to happiness or contentment for either party. It seems a little more patience, a restrained tongue, a thanksgiving for the blessings at hand, a willingness to forgive and encourage rather than faultfinding, and a spirit of kindly tolerance for the frailties of each, would bring the peace and contentment they seek here in the courts. It is hoped the matter of reconciliation will receive further consideration despite the decision we must reach under the record before us.

From the record we learn the plaintiff-wife, age 54, and the defendant-husband, age 55, were married June 30, 1934, and for almost 20 years have lived in Des Moines in a home they purchased in 1946 for approximately $4700. They are the parents of three children, Daniel, age 28, now married; Carmen, age 22, also married; and Carla, age 16, in high school. Mr. Lehmkuhl, a welding instructor employed by the Des Moines Independent School District at Des Moines Technical High School, has been so employed since 1942. Mrs. Lehmkuhl has not been employed outside the home. The parties separated on February 25, 1963, and plaintiff brought her suit for separate maintenance about two weeks thereafter. A restraining order prohibited defendant's return to the premises except to get his personal property,

and it was not removed during the pendency of this suit.

Pursuant to trial, a decree of divorce was entered on June 30, 1965, in favor of defendant, and plaintiff's petition for separate maintenance was dismissed. The trial court found that plaintiff had not sustained her burden to prove by a preponderance of the evidence that defendant was guilty of such cruel and inhuman treatment as to impair her health and endanger her life, that defendant had done so in his cross-petition, and that custody and control of Carla should be awarded to plaintiff subject to reasonable rights of visitation by defendant, which included every other weekend from Friday after school to the commencement of school the following Monday morning, and also one month during the summer vacation, which was specifically spelled out in the decree. Plaintiff was awarded $100 per month child support until Carla "attains her majority, marries, or becomes self-supporting." The decree further provides $200 per month alimony for plaintiff commencing August 1, 1965, and continuing until plaintiff dies or remarries, awards the home to plaintiff, who must assume the $2700 encumbrance thereon, awards each party the automobile then in his possession, awards the household furnishings to plaintiff except for several named items awarded to defendant, and provides defendant pay certain listed indebtedness of the parties totaling about $3500 and pay plaintiff's attorney fee in the total amount of $900 and the costs of this action. Defendant did not appeal.

I. Appellant's principal complaint is that the evidence produced was insufficient to sustain defendant's right to a divorce. The general rules of law applicable to this contention are so well settled that it seems unnecessary to restate them. Certainly, extensive citations of supporting precedents are not called for. Primarily, to be entitled to a divorce under Code section 598.8(5), the aggrieved party is required to prove (1) inhuman treatment by defendant, and (2) danger to plaintiff's life by such treatment. Cruelty itself is not a cause, and physical abuse is not alone sufficient. The complainant must go further and establish that such treatment endangers his life. However, cruelty is the necessary foundation which must sustain a further finding that the continuance of cohabitation would, by

impairment of health, mental or physical injury, endanger the life of the complaining spouse.

■ Clearly it is not necessary to wait until the harm has been done. It is sufficient if it appears the danger is reasonably apprehended. Weatherill v. Weatherill, 238 Iowa 169, 187, 25 N.W.2d 336; Payton v. Payton, 252 Iowa 772, 777, 108 N.W.2d 358, 86 A. L. R.2d 416. The problem thus presented here is, did plaintiff's conduct amount to cruelty and was it sufficient to cause reasonable apprehension of danger? The trial court thought it was, and with some reluctance we agree.

■ There was little or no physical violence shown by either party, but physical violence is not always necessary. Arnold v. Arnold, 257 Iowa 429, 133 N.W.2d 53; Hand v. Hand, 257 Iowa 643, 133 N.W.2d 63; Alberhasky v. Alberhasky, 250 Iowa 986, 992, 97 N.W.2d 914, 918, and citations. In Renze v. Renze, 247 Iowa 25, 30, 72 N.W.2d 490, 493, we said there must be something "cruel and inhuman", something needless and beyond the ordinary arguments and quarrels of married life, something which the ordinary experience of men tells us will endanger the complainant's life if continued, before a divorce will be granted under our statute. In this area decisions are difficult and guidelines hard to draw.

■■ It is the established rule in this jurisdiction that any mistreatment which deprives a spouse of needed rest, peace of mind, and affects the nervous system so that health is undermined, may endanger life as effectively as physical violence. Arnold v. Arnold, supra; Cimijotti v. Cimijotti, 255 Iowa 77, 79, 121 N.W.2d 537, 538, and citations; Hancock v. Hancock, 257 Iowa 119, 123, 131 N.W.2d 757, 760. A long-continued, regular and persistent course of faultfinding, unjust accusations, criticisms, and belittlings, on the part of one spouse, may thus amount to cruel and inhuman treatment, and where there is also a persuasive showing that such conduct has affected the health, physical or mental, and to some extent has thereby endangered the life of the spouse, a sufficient cause has been made to justify a decree of divorce. Hand v. Hand, 257 Iowa 643, 651, 652, 133 N.W.2d 63, 69. The writer of that opinion, using the old copybook maxim, put it this way: "Water dripping day

by day will wear the hardest rock away." It was concluded that if constant criticism, unjust accusations, and belittling remarks, evidencing an antagonistic disposition, are not stopped, the healthiest spouse will succumb and his life will be endangered. Although it is an overworked statement in legal opinions, we must again say as to this issue, each case must be considered upon its own facts. In this class of cases, clearly precedents can do little more than inform the understanding and assist the judgment. Weatherill v. Weatherill, supra, and many citations.

Our review, of course, is de novo, and we must rely on the printed record for the vital and decisive evidence. True, we give some weight to the fact findings of the trial court, especially where it concerns the credibility of the witnesses, for we are denied the impression created by the demeanor of the witness as he or she testifies. Murray v. Murray, 244 Iowa 548, 57 N.W.2d 234.

The trial court here was not favorably impressed by plaintiff's demeanor before it, and expressed the opinion that she was either extremely confused as to the facts or was deliberately misleading the court. It said the court could place little or no confidence in the truthfulness or veracity of her testimony. We have carefully reviewed that testimony and prefer the "confused" conclusion. We are not persuaded she intended to mislead, but often confused her erroneous conclusions with facts. The truth generally she did not deny. However, the result is not changed, for her statements and admissions on both direct and cross-examination tended to defeat her cause and sustain defendant's. After a careful review of the record evidence, that is our decision. This, as far as bench and bar are concerned, would dispose of the appeal, but the litigants are entitled to be advised as to the evidential matters considered by the court in arriving at its conclusions. To the extent that space will permit, we shall point these out.

II. While this home was old and not in good condition when purchased, it apparently was the best they could afford and was tolerated by all until the last few years. It is agreed that at the time of this trial it was in a bad state of repair. The porches were coming off. The basement had a dirt floor and

water and rats had found their way in. The coal furnace was old and needed to be replaced, especially the ducts which had rusted out. The ceiling of the main floor was leaking, plaster was falling in the dining room, and the walls needed papering. It was the old story, when available money is used for other purposes and repairs are not made when needed, the home becomes a hovel.

During this period the plaintiff purchased and paid for a $1500 organ, a spinet piano, and a $300 accordion, for use by herself and their daughters. Defendant strenuously objected to those purchases for the reason that they could not afford them. For the same reason he also refused to agree when plaintiff wanted to sell their run-down house, and move to a ranch-style house in the country. However, at the same time he lent financial aid to his married son, that amount being undisclosed. It appears deferred and unpaid accounts and interest thereon kept mounting up, aggravating both parties. Both wrote checks on the joint bank account, but somehow no one paid some very vital bills. The house payments of $54 per month became delinquent and foreclosure was threatened. The income tax was not paid and penalty was incurred. Notes to banks became overdue, the grocery and gasoline bills over a long period became astronomical. Collectors plagued them. The stage was set for trouble in the home. Dissatisfaction was given voice. As one of Shakespeare's characters is made to say, "I will speak daggers to her, but use none." This approach seemed best for plaintiff. She only weighed 110 pounds and he 210 pounds, so physical cruelty was not expedient, to say the least. However, much of her testimony as to his cruelty is unconvincing, and none corroborated. She said he slapped her and pushed her into a chair on one occasion, and at other times when they quarreled he would push her into a door or corner with his body. At one time when she was scolding and berating him because he would not make Carla mind, he threatened to get a divorce, to put her in an institution, and take Carla away from her.

Although plaintiff is a morally good woman with many laudable principles and homemaking qualities, it is clear her dissatisfaction with circumstances was misdirected. It was

voiced as criticism of her husband and to some extent of her **daughters.** Obviously, defendant's efforts to maintain the home displeased her. He testified she berated him when he tried to teach Sunday school, telling him he had no business teaching a class, that he was lying to his class and would go to Hell sure for deceiving those he taught. He said she told him he was hated by all the neighbors and that his so-called friends hated him, that he was a big bluff, a liar and a cheat, that he was just a dumb welder bluffing his way through at school, that he was just a big bullheaded Dutchman, a small-town blacksmith, that he had the people bluffed and fooled. He testified she scolded him constantly, yelling and screaming at him loud enough for the neighbors to hear, that she would follow him berating him, both inside and outside the house, that she would not allow him to talk to their daughter Carmen alone, and even tried physically to stop him from doing so. He testified she said "I would just be filling her full of a bunch of 'Crap'" and was not specific as to her meaning. She would not let him watch T.V., would turn it down or off, preventing him from seeing the Iowa football team play. She finally loaned the T.V. to the trash man. Defendant said she told him his friends and neighbors would just as soon shoot him as look at him, that everyone would be better off "if I were dead." He said she slapped him on one occasion causing his lips to bleed, and on another occasion struck him with a fork drawing blood from his neck. He further testified that when he tried to fix the furnace pipes he was told he was not competent, that there was always something to cause her hell-raising and verbal barrages. She did not want a gas furnace installed as it was too dangerous, too hot or too cold; and an oil-fired furnace was too dirty; and she would not permit a used stoker to be installed.

Defendant also said plaintiff, without cause, accused him of running around with other women and of having an affair with his brother's wife, and called them a "pair of a kind." He testified further that plaintiff called several of his colleagues and told them he was mean and cruel, belittled and humiliated him and embarrassed him at his work by scolding and berating him within the hearing of his co-employees, teachers and stu-

dents. On one occasion she called him a son-of-a-bitch, and a friend, Garold Terry, heard it. Terry so testified and said he heard her berate defendant in a rather high, screaming voice, at times in the presence of others where he worked. Much of this testimony plaintiff did not deny, some she tried to explain as repetition of statements made to her, or excused as aggravations. Certainly the sharp statements and accusations directed to defendant could not be excused as "the truth." It must be concluded her conduct amounted to mistreatment of defendant and went beyond the ordinary arguments and quarrels expected in married life.

Mrs. Parker, a next-door neighbor, also testified she heard plaintiff berating defendant on several occasions. She said he tried to walk away, but plaintiff would follow him around. She kept "yelling and hollering" at him. She heard the arguments indoors and out. In an attempt to impeach this testimony, plaintiff said Mrs. Parker was drunk and did not tell the truth.

Defendant testified that in spite of the large grocery bills, he was often fed scraps and guests were given the best food. He said his wife had not shared his bedroom for six months before he left the house, and that she told him to leave the premises when he left in February 1963.

III. Defendant said all this bothered him, made him nervous until he was afraid of a "nervous explosion." Although he did not lose weight, did not seek medical advice nor take sleeping pills, he testified that when he was wrought-up after a tirade from his wife, he would take an aspirin or two before retiring. His colleague, John Cooper, testified that some time before defendant left plaintiff he appeared nervous, did not perform as a man of his caliber should, made blunders in his work on a critical project that was not normal. He said in the fall of September 1963 and through 1964 defendant was much improved "because he seems to be without the tension that prevailed before."

While the showing of the effect of this verbal cruelty is not great, under our cases we cannot hold that the trial court made an error in holding defendant had carried his burden to show by a preponderance of the evidence that plaintiff's actions

in constantly scolding and berating him were cruel and inhuman, and that the effect on him was sufficient to entitle him to relief as prayed. See Arnold v. Arnold, supra, 257 Iowa 429, 434, 133 N.W.2d 53, 57; Hand v. Hand, supra, 257 Iowa 643, 652, 133 N.W.2d 63, 69; Smith v. Smith, 258 Iowa 557, 139 N.W.2d 453. It is not necessary that he stay until his health actually fails, for then no one could benefit by the relationship termination.

■ IV. True, the corroboration was not strong, but we think it was sufficient. It is often not possible nor is it necessary to corroborate every detail of complainant's testimony. Code section 598.7 does not so require. Corroboration is required to prevent collusion between the parties, and we think the evidence makes it abundantly clear that situation did not exist here. See Arnold v. Arnold, supra; Payton v. Payton, 252 Iowa 772, 776, 108 N.W.2d 358, 360, 86 A. L. R.2d 416, and citations; Hancock v. Hancock, supra, 257 Iowa 119, 123, 131 N.W.2d 757, 760, and citations.

■■ V. Appellant contends the evidence makes the doctrine of recrimination applicable. The trial court did not agree, nor do we. Although we have recognized this doctrine as a defense to the charge of cruel and inhuman treatment (Kentzelman v. Kentzelman, 245 Iowa 579, 583, 63 N.W.2d 194, and citations; Paulsen v. Paulsen, 243 Iowa 51, 57, 50 N.W.2d 567; and Leigh v. Leigh, 247 Iowa 358, 361, 73 N.W.2d 727), we find insufficient corroborative evidence of defendant's acts or language toward plaintiff to justify the application of this doctrine. For the doctrine of recrimination to apply, we have said both parties must show adequate grounds for divorce in their own right. The trial court found plaintiff had not carried her burden in that regard, and we agree. Nothing beyond a showing of usual family disputes was shown as to defendant, and of course even if defendant was entirely to blame for the financial troubles here, which he was not, nonsupport is not an element necessary to obtain a divorce on the ground of desertion. Parker v. Parker, 244 Iowa 159, 162, 55 N.W.2d 183, 185, 186. It might, however, have a bearing on that charge. In any event we think it is abundantly clear the parties were

not equally guilty. See Bartels v. Bartels, 246 Iowa 942, 954, 69 N.W.2d 41, 47.

VI. Appellant complains of an apparent lack of consideration by the trial court of her allegations of desertion as an added ground for her plea for separate maintenance. It is true the court made no finding as to this allegation, but we think none was necessary. There was no showing that her plea for a reconciliation in letters written to defendant on or about September 9, 1965, could be complied with in the face of the injunction preventing his return to the home. In those letters plaintiff asked defendant "Please come back soon", but did not ask the court to lift its restraining order. While defendant expressed no willingness to comply with her request, to constitute desertion it must appear that his refusal was wrongful.

While the period of desertion need not be two years in separate maintenance actions (Shipley v. Shipley, 187 Iowa 1295, 1306, 175 N.W. 51, and citations) as is necessary in divorce actions (Kupka v. Kupka, 132 Iowa 191, 192, 109 N.W. 610), it must appear the desertion was in the absence of consent or misconduct of the deserted party. Tallmon v. Tallmon, 166 Iowa 370, 147 N.W. 746. Both parties cite and rely on the same authorities for their contentions, but, as pointed out by appellee, there can be no question that plaintiff consented, even invited defendant to leave the family home. When he did so, the invitation to return, even though made in good faith, could not be accepted in view of the restraining order then in full force and effect against it. This would dispose of that issue without considering the question of misconduct by the deserted party. However, in view of our decision on defendant's cross-petition for divorce, it cannot be said he departed without just cause. See Nelson v. Nelson, 246 Iowa 760, 763, 68 N.W.2d 746. Overtures for reconciliation must be made in good faith in order to put the other spouse in the wrong and place him or her in the legal position of the deserter. Fryauf v. Fryauf, 234 Iowa 894, 896, 14 N.W.2d 626, 627; 24 Am. Jur.2d, Divorce and Separation, section 140, page 297. Plaintiff's contention may have had more merit if she had asked the court to terminate the restraining order before inviting defendant to return, al-

though it would not have purged her causal liability. At any rate we must conclude plaintiff failed to show herself entitled to separate maintenance or divorce on the grounds of desertion under Code section 598.8(2).

 VII. We next consider the adequacy of the trial court award to appellant and to her attorney. In determining the amount of alimony to which a wife is entitled it is not only the wife's necessity, but also the husband's ability to pay that must be considered by the court. We have said, things to be considered are the age, health and future prospects of the parties, as well as the contributions of each to the joint accumulations, the obligations, including children, and the earning capacity of each party, their past conduct, the length of the marriage, and any other facts which might aid the court in reaching a just and equitable decision. Cole v. Cole, 259 Iowa 58, 60, 143 N.W.2d 350, 352; Brannen v. Brannen, 237 Iowa 188, 21 N.W.2d 459; Nelson v. Nelson, supra, 246 Iowa 760, 68 N.W.2d 746.

 It is true the award for the proper care, support and education of the child Carla must be adequate considering defendant's ability to pay. Cappel v. Cappel, 243 Iowa 1363, 1368, 55 N.W.2d 481. The trial court provided $100 per month until she reaches 21 years of age, marries or becomes self-supporting. It provided $200 per month to plaintiff as alimony until she dies or remarries. It gave to her the equity in the home and provided that defendant pay outstanding obligations of about $3500. Without considering the fault attributable to the parties, we doubt that defendant can pay a great deal more and maintain himself in his station in life. Cole v. Cole, supra, and citations; Berry v. Berry, 253 Iowa 388, 112 N.W.2d 663; Donovan v. Donovan, 231 Iowa 14, 300 N.W. 656.

Defendant's earned net income is shown to be approximately $8000 per year. While his needs and expenses would increase when he is living alone, after the liquidation of his indebtedness and after the support payments for Carla cease, he will have no foreseeable financial problems. He disclosed an ability to pay off indebtedness with dispatch in 1963 when $3500 in old bills was paid, and it is reasonable to believe he

will do the same with present obligations. While it is doubtful plaintiff can obtain work outside the home, although it does not appear she is incapacitated or unable to do so, perhaps there is some indication that her mental and physical health is not good. Under this decree she must pay off some $2700 indebtedness on the home at $54 per month, including taxes and insurance. To retain the home we think this expense will be difficult indeed for plaintiff, especially after the support payment for Carla ceases. We conclude, after those $100 payments cease, the amount of alimony plaintiff receives must be increased $50 per month.

VIII. While well aware of the able and conscientious representation of his client, we are not convinced the attorney fees awarded by the trial court of $900 should be disturbed. We are satisfied the court was right in allowing these fees to plaintiff's attorney and do not agree that they are excessive. Clyde v. Peavy, 74 Iowa 47, 36 N.W. 883; McMurray v. McMurray, 256 Iowa 97, 126 N.W.2d 336. Plaintiff's counsel's strong effort to avoid a legal separation and obtain for her an increase in alimony is not overlooked, but we find no just basis to increase defendant's burden by increasing the attorney fees he must pay.

IX. Defendant's motion to strike appellant's reply brief and to tax costs to her, submitted with the appeal, has been considered and is denied.—Modified and affirmed.

All JUSTICES concur.