MARY JANE ERICKSON, appellant, v. WILLIAM K. ERICKSON, appellee.

No. 52100.

(Reported in 154 N.W.2d 106)

NOVEMBER 14, 1967.

Hart & Hart, of Elkader, for appellant.

Donohue, Wilkins & Donohue, of West Union, for appellee.

GARFIELD, C. J.—Mary Jane Erickson sued William K. Erickson for divorce on the ground section 598.8, subsection 5, Codes 1962, 1966, designates "such inhuman treatment as to endanger the life of his wife." Following trial the court found proof of such treatment was insufficient and that plaintiff had condoned any mistreatment of her by defendant. Plaintiff

has appealed from dismissal of her petition based on such findings.

I. Plaintiff's first proposition relied on for reversal asserts error in the overruling of her motion that defendant make his answer more specific by stating what acts of plaintiff constituted failure to keep house properly, the facts upon which defendant alleges she was lazy and the times when she refused to do the customary work of a housewife. Also that defendant state when and where plaintiff has nagged him about not joining the Catholic Church; that he state the facts showing plaintiff had a vile temper and when and where she called defendant obscene names and threatened suicide.

Basis for the motion is rule 112, Rules of Civil Procedure, which provides:

"A party may move for a more specific statement of any matter not pleaded with sufficient definiteness to enable him to plead to it and for no other purpose. It shall point out the insufficiency claimed and particulars desired."

Cook's Iowa Rules of Civil Procedure, Revised Edition, Volume 1, pages 728, 729, quotes this Comment of our Advisory Committee and the author under rule 112:

"Supersedes Code 1939, §§ 11127, 11128. This motion will no longer lie to obtain evidence or information necessary to prepare for trial as distinct from preparation to plead. Discovery should be pursued under Rules 135–139, 121–134.

"By rephrasing the Code sections it is hoped to avoid the indiscriminate practice of moving for, and ordering, amendments not actually needed but which cause delay and expense. Rule 112 above was also adopted to correct a peculiarly needless abuse of the former practice.

"Author's Comment

"The purpose of this Rule sufficiently appears from the foregoing Comment of the Advisory Committee. It is new. The former decisions and court practice should not apply to such motions now."

See also White v. Flood, 258 Iowa 402, 404, 405, 138 N.W.2d 863, 865.

■ We are not inclined to hold the court's ruling was reversible error. Plaintiff's counsel seemed to be able to reply to the answer as filed. He did not resort to discovery proceedings to prepare for trial on the issues raised. There was no evidence plaintiff threatened suicide and she could not have been prejudiced by this unproved allegation of the answer. The two precedents plaintiff cites on this proposition antedate the taking effect of our Rules of Civil Procedure.

II. Plaintiff and defendant were married July 4, 1959, after keeping company two years or more. Plaintiff was 18 and had recently graduated from high school. Defendant was 33. They lived on a farm until plaintiff left and went to nearby Elkader to live November 20, 1964, when her divorce petition was filed. They had no children.

The marriage proved to be an unhappy one. Plaintiff was a Catholic and defendant a Protestant. Defendant refused to be married in a Catholic church and plaintiff consented to be married in another church. Both before and after the ceremony was performed defendant promised plaintiff he would consent to a second ceremony by a Catholic priest. Defendant kept putting plaintiff off on this, however, and no such ceremony was performed. There is much testimony by plaintiff that defendant refused to be remarried by a priest or to join her church unless plaintiff would have herself "fixed" so she could not bear children. Defendant as a witness admits he told plaintiff such an operation was a requisite to his joining her church.

Of course this was too high a price for defendant to impose as a condition for living up to his promise. If children had been born to the marriage this action might never have been brought.

The difference in ages of the two parties and the friends of each seems to have been another impediment to their happiness. Plaintiff turned for companionship to those she knew in school and others of their age or younger rather than to those of defendant's age.

A third circumstance which may have contributed to their marital difficulties is that they engaged in premarital intimacies rather than to wait for the marriage ceremony.

Except perhaps for the matters just suggested, this long record follows a familiar pattern, differing only in detail. This early testimony of plaintiff reveals the general nature of her complaints:

"Defendant was rude, mean, argumentative and beat me up five or six times. Said I was clumsy on my feet, wasn't as good as the neighbors; didn't work enough around the barn and house, told me to get my things and get out and get my ass down the road. At least three times told me to get out.

"Quite often told me I was clumsy on my feet, didn't use my head, didn't think, didn't cook things right, like his mother did. * * * His mother lived with us on the farm about a year and a half to two years. * * * If something did not go right in the barn he would complain for a long time, continuously, and some things he took out on me. Complained about me not working in the barn enough, and if I did bed down the cows would say I didn't do it right, even though I tried.

"Didn't have running water and he would say I washed too often, used too much water, should learn how to proportion it, and I should get the water myself. * * * I wasn't supposed to carry water because of my bad back, and I had to limit myself to lifting ten pounds."

Much of the record is devoted to the details of the six or more beatings charged against defendant. He admitted he had resorted to physical violence toward plaintiff on at least three occasions but asserted, in effect, she had said or done something to provoke or deserve such treatment. The trial court thought plaintiff was inclined to exaggerate and that she held her own in these physical encounters. However, we think she was usually, if not always, the loser.

We are not sure these physical encounters constitute the strongest part of plaintiff's case. Defendant said some pretty mean things to her. In the first six months of the marriage, when the parties were at the home of defendant's sister and husband, the husband said he saw plaintiff's father with a woman other than her mother. Defendant joined in teasing plaintiff about her father's conduct in this and other respects, notwithstanding her request that they desist.

Plaintiff testified "Defendant told me my father was dying of cancer, everyone knew it, he wasn't any good anyway, he had lost everything he had, and kept up this talk. I asked him to stop." When plaintiff cried about the matter defendant laughed. While the version of defendant and his witnesses differs from plaintiff's, we think there is corroboration of the substance of her testimony.

Plaintiff also testified that at another time defendant said her deceased great uncle was a drunkard, ran around with women, was not any good and kept repeating these accusations. On another occasion, according to plaintiff, defendant told her her dead grandfather had committed murder, disregarding her request that he desist. Plaintiff said the assertions were untrue.

■ III. Of course, inhuman treatment does not furnish cause for divorce unless it endangers life. We have frequently held life may be endangered by impairment of health. Also that life may be endangered where such danger is reasonably to be apprehended and that conduct may amount to such inhuman treatment as to endanger life of the spouse even without physical violence or mistreatment. Any mistreatment which deprives the spouse of needed rest and peace of mind and affects the nervous system so health is undermined may endanger life as effectively as physical violence. Arnold v. Arnold, 257 Iowa 429, 434, 133 N.W.2d 53, 57, and citations; Lehmkuhl v. Lehmkuhl, 259 Iowa 686, 145 N.W.2d 456, 460, and citations.

■ We may as well refer here also to the requirement of Code section 598.7 that the testimony of plaintiff be corroborated. Corroboration is required to prevent collusion between the parties. It is not necessary that every detail of plaintiff's testimony be corroborated or that corroboration alone sustain the decree. Defendant's testimony, his admissions or failure to deny plaintiff's testimony, may furnish the necessary corroboration. Lehmkuhl case, supra, and citations at page 696 of 259 Iowa, pages 462, 463 of 145 N.W.2d; Hand v. Hand, 257 Iowa 643, 647, 133 N.W.2d 63, 68.

IV. The showing that plaintiff's life was endangered by defendant's treatment of her is not strong but there is some

evidence thereof. She testified: "His cross disposition made me nervous. I was upset most of the time. Couldn't stand it any more. Something was going to happen that might lay me up for life. Was always worked up inside, nervous, bawling and scared. I was afraid of physical harm, of being paralyzed, of my husband doing damage to me which would result in death. * * * Since we separated I am more relaxed, not as tense, don't break down and cry except when defendant comes around, threatens and scares me."

Like the showing of danger to life, corroboration of plaintiff's testimony is not strong but, considering defendant's testimony, it is not entirely lacking.

V. Except for details of defendant's physical abuse of plaintiff we have tried to indicate the evidence favorable to her case. There is other evidence less favorable to it which should be mentioned.

Plaintiff evidently held her own in name-calling. Defendant testified she called him a s-o-b a lot. Plaintiff admitted she sometimes cursed defendant and has called him a s-o-b. Defendant also said plaintiff called his mother the same name "and one thing or another."

Plaintiff's mother was employed evenings in the theatre at Elkader and plaintiff also worked there evenings the last year or more she lived with defendant. When their work was finished plaintiff and other young people who helped in the theatre frequently went to a drive-in before going home. Sometimes it was midnight or later when she went home. Sometimes plaintiff bought beer for them to drink. Most of the others were minors. Plaintiff's furnishing beer to them was therefore a crime.

Twice after leaving the theatre in the summer of 1964, plaintiff and several others younger than she went swimming. One time they went to Elgin and stayed about three hours until 11 or 12. Another time they went in the pool at Elkader after hours. A boy, then about 17, in the party was arrested for violation of a municipal ordinance. On this occasion plaintiff was without a bathing suit and jumped in the pool with her clothes on.

In the summer and fall of 1964 a school friend of plaintiff named Marilyn, a local beauty contest winner, was singing in so-called nightclubs in and around Dubuque. Plaintiff spent many evenings with Marilyn, her boyfriend and one of the young men in the band, a divorcee named Charlie. She also spent several nights with Marilyn in Dubuque and visited her at Clear Lake and elsewhere. Plaintiff also went to some nearby places in Wisconsin with Charlie. Plaintiff and the others indulged in more or less drinking evenings after Marilyn finished her nightclub appearances. Plaintiff also talked to Charlie long distance and wrote some letters to him. Her explanation of these calls and letters was that Marilyn was ill, had no 'phone and plaintiff wanted to inquire as to her friend's condition.

When plaintiff, as stated, left home November 20 she stayed a month in the hotel at Elkader. Charlie was registered there one night during the month. There is no evidence of any immoral conduct of plaintiff with Charlie, Marilyn or any of plaintiff's young friends.

The trial court thought plaintiff became somewhat infatuated with the kind of life Marilyn and her friends lived, tired of life on the farm and this, rather than defendant's treatment of her, was a principal cause of her leaving home. This view finds some support in the fact plaintiff lived in Nashville, Tennessee, with Marilyn three months starting March 1, 1965.

VI. Defendant seeks to justify the decree by application of the doctrine of recrimination. The argument is without merit. The doctrine referred to is that where both spouses have cause for divorce a divorce will not be granted to either. Arnold v. Arnold, 257 Iowa 429, 433, 133 N.W.2d 53, 56 and citations.

One sufficient reason the doctrine of recrimination is not applicable is that any misconduct of plaintiff toward defendant did not, as far as shown, endanger his life and he is therefore without cause for divorce. Arnold case, supra, at pages 437, 438 of 257 Iowa, pages 56, 59 of 133 N.W.2d, and citations.

VII. There remains the issue of condonation, pleaded by defendant, which the trial court found was established.

■ Condonation is frequently defined as the forgiveness, express or implied, by one spouse of another for a breach of marital duty, with an implied condition the offense will not be repeated. 24 Am. Jur.2d, Divorce and Separation, section 203; 27A C.J.S., Divorce, section 59a, pages 194, 195. See also annotation, 32 A.L.R.2d 107, 121–135; Zuerrer v. Zuerrer, 238 Iowa 402, 407, 408, 27 N.W.2d 260, 262, 263, and citations.

■ Speaking generally, courts are slow to apply the doctrine of condonation where there has been continued cruelty. Reluctance to seek a divorce because of continuing cruelty should ordinarily be commended rather than penalized. See Duwe v. Duwe, 246 Iowa 1336, 1344, 1345, 72 N.W.2d 501, 506, 507; Bouska v. Bouska, 249 Iowa 281, 285, 286, 86 N.W.2d 884, 886, 887; Payton v. Payton, 252 Iowa 772, 779, 108 N.W.2d 358, 362, 86 A.L.R.2d 416, 424; Lane v. Lane, 253 Iowa 92, 96, 111 N.W.2d 286, 288; Hancock v. Hancock, 257 Iowa 119, 131 N.W.2d 757, 759; 24 Am. Jur.2d, Divorce and Separation, section 216, page 371.

■ Continued cohabitation is not necessarily a condonation of inhuman treatment. Duwe v. Duwe and citations; Payton and Lane cases, all supra.

The evidence is without dispute that throughout the more than five years plaintiff and defendant lived together they regularly engaged in frequent acts of sexual intercourse. Plaintiff testified the sex acts occurred very often, seven times a week; the first part of the year they separated (in November) they occurred two to four times a week, "maybe" one to three times a day, "might skip a month, if I had a lot of pain and couldn't accept him he became mad." She said they engaged in marital relations within the week they separated.

Defendant testified that during the last year of marriage their sex relations were about the same when plaintiff was home and they occurred a day or two before she left.

As stated, plaintiff left home November 20, 1964, and her petition was filed that day. Also as stated, she lived the first month at the hotel in Elkader. She then moved to the Reimer Building there and from March 1 through May 1965 she lived in Nashville with her friend Marilyn.

Defendant testified that after the separation he and plaintiff were "downtown" different times and had a few drinks; on New Year's eve they went to a dance in Decorah with another couple, got home at daylight, plaintiff was then staying in the Reimer Building where he visited and slept with her more than once.

On another occasion after the separation the parties had drinks with Marilyn and her boyfriend in two night spots (one was in Wisconsin), Marilyn said she was intoxicated and her boyfriend suggested getting a motel room with two beds. Plaintiff consented to this but Marilyn refused.

While plaintiff was staying in Nashville she returned to see defendant and he took her to the train in Wisconsin to return to Nashville. Defendant testified he "had been with her when she was at home. I bought her train ticket and we kissed goodbye. Gave her money when she asked me for it."

The above testimony is without dispute. There is no substantial evidence defendant abused plaintiff after the separation. Indeed the evidence is there was less cause for complaint in this regard for at least several months prior to the separation than formerly. We are persuaded the evidence of the conduct of the parties, particularly after the separation, supports the trial court's finding of condonation and we therefore affirm the court's denial of a divorce.

The extended annotation in 32 A.L.R.2d 107, 134–137, states: "It has also been said in numerous cases that cruelty, indignities, and the like are condoned where the parties voluntarily resume cohabitation after a separation."

At page 135 the annotator observes that "the better view concerning the significance of a resumption of cohabitation seems to be that such an act is merely evidence and is not of itself a condonation."

At page 136 it is said, "And proof of a resumption of normal marital relations is usually sufficient to permit an inference that prior cruelty has been condoned."

24 Am. Jur.2d, Divorce and Separation, section 216, page 372, contains this: "If the parties have separated, a resumption of cohabitation is of greater significance than a mere continu-

ance of cohabitation in connection with the condonation of cruelty, indignities, and the like. A resumption of cohabitation operates as a condonation of prior cruelty."

27A C.J.S., Divorce, section 61c, page 210, states: "Voluntary cohabitation during the pendency of the divorce proceedings ordinarily operates as a bar to divorce and condonation." Id., section 61d, page 212, adds: "If the parties occupy the same room and bed, there is a strong presumption of marital intercourse and a consequent condonation of the offense, although this presumption may also be rebutted."

VIII. Early in the pendency of the appeal appellant filed herein application for alimony, support and suit money, and attorney fees. Following hearing, appellee was ordered to pay the cost of the reporter's transcript of the testimony, printing the record and appellant's briefs and to pay $150 to be applied on appellant's attorney fees on this appeal. Our order further provides final disposition of all the above matters shall be made at the time the appeal is decided.

Appellant has made verified showing appellee has failed to pay $71.25, cost of printing appellant's reply brief, as our order provides. Such cost is to be taxed to appellee. Other printing costs have been paid by appellee in accordance with our prior order and are not to be taxed. Any costs of the appeal other than for printing are to be taxed to appellant.

Appellant's counsel say a reasonable fee for their services on this appeal is $1000, of which the $150 above referred to has been paid.

Notwithstanding appellant does not obtain a reversal of the trial court's decree, we think an allowance of fees for her attorneys on this appeal, in addition to the $150 previously allowed, is proper. This is implicit from our holding in Renze v. Renze, 247 Iowa 25, 31, 72 N.W.2d 490, 493. See also Jackson v. Jackson, 248 Iowa 1365, 1376, 1377, 85 N.W.2d 590, 597; Andreesen v. Andreesen, 252 Iowa 1152, 1160, 1161, 110 N.W.2d 275, 280, and citations; Arnold v. Arnold, 258 Iowa 850, 859, 860, 140 N.W.2d 874, 880 (citing Renze v. Renze, supra, with apparent approval); 24 Am. Jur.2d, Divorce and Separation, section 592.

27A C.J.S., Divorce, section 221h, pages 960, 961, states: "Usually, the right to counsel fees on appeal does not depend on the outcome of the appeal, so that the fact that the judgment or order from which the wife appeals is affirmed on appeal * * * does not preclude an allowance to the wife for counsel fees and expenses of suit in prosecuting * * * the appeal."

We think a total of $750 should be allowed appellant from appellee as counsel fees on this appeal, on which there should be credited the $150 previously allowed and paid, leaving a balance of $600. Judgment shall be entered in the trial court for such amount.

Except for the allowances herein made the decree is affirmed.—Modified, affirmed and remanded.

All JUSTICES concur.